# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### SOUTHEASTERN DIVISION

EVELYN LINCOLN,                    )
                                   )
      Plaintiff,            )
                                   )
    vs.                         )      Case No. 1:08CV82ERW/MLM
                                   )
MICHAEL J. ASTRUE,                 )
Commissioner of Social Security,   )
                                   )
      Defendant.            )

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the final decision of Michael J. Astrue ("Defendant") denying the application of Evelyn J. Lincoln for Disability Insurance Benefits under Title II of the Social Security Act (the "Act"), 42 U.S.C. § 401 et seq. Plaintiff filed a brief in support of the Complaint. Doc. 15. Defendant filed a brief in support of the Answer. Doc. 17. This matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1). Doc. 5.

## I.
## PROCEDURAL HISTORY

Plaintiff filed an application for disability insurance benefits on March 1, 2005.[1] Tr. 70-72. Plaintiff's application was denied, and she requested a hearing before an Administrative Law Judge ("ALJ"). Tr. 24-25, 43-52. After a hearing held on September 20, 2006, ALJ Craig Ellis found that

---

[1]      Plaintiff filed a prior application for disability benefits on November 13, 2003, which was initially denied and then denied by an ALJ on January 30, 2004. Tr. 15. The ALJ in the matter under consideration did not reopen Plaintiff's prior application. As such, Plaintiff's prior application is not subject to judicial review. 20 C.F.R. § § 404.957(c)(1), 404.987-.989, 416.1557(c)(1), 416.1587-.1589.

Plaintiff is not disabled. Tr. 15-23. On April 14, 2008, the Appeals Council denied Plaintiff's request for review of the ALJ's decision. Tr. 3-5. As such, the ALJ's decision stands as the final decision of the Commissioner.

**II.**

**TESTIMONY BEFORE THE ALJ**

**A.      Testimony by Plaintiff**

Plaintiff testified that, at the time of the hearing, she was fifty-eight years old; that she is five foot tall and 113 pounds; that she is right-handed; that she has her GED;  that she can read, write, and do arithmetic with a calculator; that she has no income other than her husband's salary; that she last worked at Rubbermaid as a forklift driver; that she quit her job at Rubbermaid after she suffered an anxiety attack; and that she has not worked since August 2003. Tr. 438-42.

Plaintiff further testified that she was treated by a psychiatrist or a psychologist in 1967 for approximately three months after her six-month old son died and that she was taking Xanax for anxiety at the time of the hearing. Plaintiff testified both that she was taking Paxil for her nerves at the time of the hearing and that she has no health insurance and was, therefore, not taking Paxil. Tr. 442-43, 458.  Plaintiff testified that generic Paxil costs over $13 a month with insurance, and that she did not know the cost of Paxil without insurance. Tr. 460-62.

Plaintiff also testified that she smokes one to two packs of cigarettes a day; that she drinks approximately eight beers a night to assist in sleeping; that she does not use any illegal substances; that she goes to the grocery store once every two weeks; that her husband helps her do the laundry; that the last time she was over 100 miles from her house was the previous summer to visit friends in Fayetteville, Arkansas; that she spends her days cleaning, making coffee, and making lunch; that she does dishes by hand; that she cuts the grass on a riding lawn mower; that she walked from the car to

2

the hearing; that her husband takes items off the shelves in the store and that she can reach items located at eye level; that when she is shopping her husband picks up a gallon of milk; that she can carry a box of cereal; that performing household chores can aggravate her back; and that she cannot vacuum Tr. 443-47, 449-51.

Plaintiff said that the constant pain in her back prevents her from working a forklift; that she has never had surgery nor has been hospitalized; that her pain is in her lower back; that she injured her back in 2001; that she was on light duty restrictions after the injury; that Rubbermaid accommodated her; that she has a pain level of a five or six; that walking intermittently worsens her pain; that sitting down alleviates the pain; that she has difficulty using stairs and walking up hills; that uneven surfaces cause her pain; that she has pain mostly in her right leg and down her left leg to about the top of her calf muscle; that she must elevate her legs approximately four times a day; that she only takes aspirin for pain "because that's all [she] can afford"; that both her legs become numb if she sits too long; that she can relive the numbness when she stands; that she alternates between standing and sitting during the day; that she can stand in one place for about five minutes[2]; that she can sit for ten to fifteen minutes and must shift her weight around during that time; that Dr. Park, a neurosurgeon, gave her steroid injections for her back on two separate occasions; that this procedure alleviated her back pain; that her back pain returned approximately a month after the steroid shot treatments; that Dr. Park never suggested surgery; that she used a cane at one time; that she uses a stick or shovel when walking outside on uneven surfaces; and that bending or lifting items aggravates her pain. Tr. 449-55, 459-60.

---

[2] The transcript states that Plaintiff said she can stand for "five months." The court assumes Plaintiff meant to say she can stand for "five minutes."

Plaintiff further stated that she suffers from epilepsy; that she was diagnosed with epilepsy in the 1970s; that no restrictions have been placed on her driver's license as a result of epilepsy; that she has "spells" as a result of epilepsy; that when she has a spell, she gets "a real strange feeling...and then it's like [her] brain just goes numb"; that Xanax does not help these spells; and that the spells are nerve-related to head injuries sustained in a car accident she was in when she was sixteen; that these spells last about five minutes; that the spells are sporadic; that she had four or five of them in the week prior to the hearing; that stress causes the spells; that family situations cause stress; that she takes stress vitamins with iron; that she previously took Dilantin for her epilepsy; that the doctor took her off of Dilantin "because the side effects were so bad"; and that it has been several years since she took seizure medication. Tr. 443-44, 456-57.

## B.    Testimony by Kenneth R. Lincoln:

Kenneth R. Lincoln, Plaintiff's husband, testified that he and Plaintiff had been married fourteen years; that he was employed at Rubbermaid two years before Plaintiff quit her job; that Plaintiff was working on restricted duty from the time of her injury until the time she quit; that she could not lift over twenty pounds; that she has not worked since leaving Rubbermaid; that he will get health insurance the next month; that he places most of the items into the shopping cart at the grocery store; that Plaintiff can pick up a few light items, such as a loaf of bread; that Plaintiff does the majority of the household chores; that Plaintiff must stop and rest a few minutes while doing chores; that it is difficult for Plaintiff to get clothes out of a deep washing machine; that Plaintiff does not vacuum; that she does the yard work and can ride the lawn mower for about ten minutes; that Plaintiff must rest a few times a day; that Plaintiff cannot sit in one position for very long; that Plaintiff can sit for about fifteen minutes when watching television; that the lawn mower which he and Plaintiff

own starts with a key; and that, although he and Plaintiff own a three acre lot, approximately one and a half acres is mowed. Tr. 463-67.

**C.    Testimony of the Vocational Expert**

Vocational Expert Gary Weimholt ("VE Weimholt") testified before the ALJ that he did not know the Plaintiff or her husband; that he did not discuss the case with Plaintiff's attorney; and that he had reviewed Plaintiff's file and listened to her testimony. Tr. 468. VE Weimholt stated that Plaintiff's past work as "a forklift operator in a warehouse type situation ... [constituted] a semiskilled job at the medium physical demand level"; that Plaintiff's position was rated "medium" by the DOT, "because, at times, a forklift operator is going to have to get off the fork truck and move things in a warehouse by hand"; and that the job was also rated "medium" in the way Plaintiff had performed it. Tr. at 468-469.

The ALJ asked VE Weimholt to assume three residual functional capacity ("RFC") hypothetical situations. Tr. 469. As to the first RFC, the ALJ stated:

> "[A] hypothetical individual with the age, education and work experience of the Claimant ... who could occasionally lift and carry 50 pounds, frequently lift and carry 25, who can stand, walk about six hours over an eight-hour workday, who must avoid concentrated exposure to vibration to the body and it's based on the assessment of agency reviewing physician ... . Based on the agency reviewing psychologist, James Spence, PhD., there's no severe mental impairments so no limitations related thereto."

Tr. 469.

In reference to this RFC, the ALJ questioned whether an individual "[w]ith the age, education and work experience of the [Plaintiff] would be able to do the past work as a forklift driver." VE Weimholt answered that an individual could perform such a job in multiple instances. Tr. 470.

The ALJ stated, for the second hypothetical, that VE Weimholt should assume that the same individual in the first hypothetical required "a sit/stand option at will and can bend, stoop and crouch

only occasionally." Tr. 469. The ALJ questioned whether such a person could perform past work of a forklift driver. VE Weimholt responded that a forklift driver job could not be performed with alternating sitting and standing; that an individual could perform other work; that there were not medium jobs which would allow for this individual to work; that there are some light jobs that would be included in the hypothetical, such as hand packaging and inspection, small part assembly jobs with no production machine, like assembling electrical accessories, and cashiering jobs, cashier II title; and that there exist approximately 2,500 of each type of these jobs in the state economy. Tr. 471-472.

> The ALJ presented a third RFC hypothetical, as follows:
>
> Can occasionally lift and carry 20 pounds, can frequently lift and carry 10 pounds, can stand/walk for about six hours over an eight-hour workday, can sit for about six hours over an eight-hour workday, needs a sit/stand option at will, can ben, stoop or crouch occasionally and [] a nonexertional limitation, no fast-paced work with high productivity quotas. ... . [W]ould a hypothetical individual with the age, education and work experience of the Claimant have any transferable skills to that RFC?

Tr. 469-470.

VE Weimholt opined that there would be no transferable skills for a person with this third hypothetical. In response to the ALJ's question as to whether other work would be available for the person described in the third hypothetical, VE Weimholt testified that the same jobs available to the second hypothetical would also be available; that these jobs "are not machine controlled or performed on a conveyor line"; and that cashiering falls under the range of light physical activities according to the DOT. Tr. 470-73.

The ALJ stated that he was going to place the case in post-development; that he wanted Plaintiff's attorney to obtain records from Thrift-Way and Walmart and a statement regarding the cost of a thirty-day supply of twenty milligrams of Paxil; that the ALJ wanted a clarification of the time

frame when Plaintiff was insured; and that he would render a decision when all of the information was obtained. Tr. 473-75.

## III.
## RECORDS

### A. Medical Records

A March 30, 2000 notation states that Plaintiff's Xanax prescription was refilled. Tr. 189.

June 7, 2000 medical records state that Plaintiff complained of "stomach problems in the gastric area and also c/o back pain"; that Plaintiff stated that she was working on new machinery that bounced her back around; and that her back had "been tender ever since for the past couple of weeks"; that Plaintiff weighed 126 pounds; that her blood pressure was 138/80; that an examination revealed that her thoracic and lumbar area were tender; that Plaintiff was diagnosed with GERD and Paraspinal myocytis of the lumbar and thoracic area; and that it was recommended that Plaintiff use heat, rest, and take Soma, Provacid, and Celebrex. Tr. 189

Records of Prompt Care Heartland Family Physicians ("Prompt Care"), dated February 17, 2001, state that Plaintiff complained of a work injury from the previous evening and leg numbness; that Plaintiff stated that she "was hit on right hip [with] a hand jack [causing her] to hit [her left] hip on [a] forklift"; that Plaintiff said she had minimal pain at the time of the injury; that Plaintiff was diagnosed with a lumbar strain; and that Plaintiff was prescribed Celebrex. Tr. 186, 188.

Medical records dated February 19, 2001, from Prompt Care reflect that Plaintiff said that a forklift "pushed her against the wall"; that Plaintiff complained of pain in both hips; that an examination revealed bruising and discoloration on lateral aspect of her right hip; that tenderness was indicated on both hips and low lumbar region; that Plaintiff did not have numbness; that no obvious abnormalities were noted on an x-ray of both hips; that an "AP of the lumbar spine was normal"; and that Plaintiff was prescribed Celebrex and Darvocet. Tr. 187.

Prompt Care medical records, dated March 31, 2001, state that Plaintiff reported with "SOB," palpitations, and chest concerns; that Plaintiff reported that her heart was beating fast, that she had minimal nausea; and that Plaintiff had a pulse of ninety-five. Tr. 184.

May 3, 2001 records from Prompt Care reflect that Plaintiff complained of a sinus congestion and a cough and that Plaintiff was currently taking Xanax. Tr. 181-182, 183.

June 18, 2001 Prompt Care records state that Plaintiff was "very edgy, moody, and depressed" and cried intermittently; that Plaintiff was on Apresoline; and that an increase in Paxil was recommended. Tr. 185.

Records from Prompt Care, dated July 2, 2001, state that Plaintiff reported with symptoms of depression; that Plaintiff weighed 123 pounds; that her blood pressure was 158/86; that Plaintiff was "doing fine on Paxil [] and taking Xanax"; that Plaintiff had no specific complaints, "headaches, dizziness, shortness of breath or GI/GU symptoms"; that "the exam was otherwise unremarkable"; that Plaintiff's neck was supple; that she had no thyromegaly; and that Plaintiff had clear lungs and heart sinus rhythm. Tr. 180.

Records of St. Francis Medical Center, dated July 10, 2001, reflect that Plaintiff presented in the emergency room. Karen Ryan, M.D., of St. Francis Medical Center, reported on this date that Plaintiff sustained an injury on July 10, 2001; that Plaintiff fell backwards while standing on a conveyor belt; that Plaintiff's primary complaint was tailbone pain which was increased with sitting, walking, and transitional movements; that large bruises were present on Plaintiff's right leg and left arm; that Plaintiff stated that transitional movements increased her tail bone pain; that Plaintiff did not report any cardiovascular, pulmonary, liver, renal or GI problems in her medical history; that Plaintiff was currently taken Xanax and Paxil; that the midline of Plaintiff's sacrum and coccyx were tender when palpated; that she had ecchymosis across the lower sacrum, particularly on the left side; that

Plaintiff's pain increased with forward flexion; that Plaintiff had ecchymosis and hematoma on the right thigh; that Plaintiff had "two hematomas on the anterior ankle and mid foot"; that Plaintiff had a small contusion on the upper lateral left arm; that x-rays were negative for a fracture in either the sacrum or coccyx; that Plaintiff was prescribed Vioxx; that Plaintiff should ice her tailbone several times a day; that Plaintiff could return to work that day, with "limited" duty; that Plaintiff could not repeatedly stoop, crawl, or squat; that Plaintiff could alternate sitting, standing and walking, as tolerated; that she could not perform forklift driving; and that she should avoid prolonged sitting. Tr. 283-84.

A radiology report of July 10, 2001, states that there was no evidence of acute fracture or dislocation in the sacrum and coccyx; that mild asymmetry was present in the inferior left lateral aspect of the sacrum; that the mild asymmetry was of "uncertain etiology and may be developmental in origin"; that the right L5 segment had partial sacralization; and that the sacroiliac joints appeared normal. Tr. 285.

Dr. Ryan reported on July 17, 2001, that Plaintiff presented for a check-up related to her July 10, 2001 injury and that Plaintiff complained of right ankle and coccyx pain. Records of this date further reflect that Plaintiff stated that the pain had increased in her buttocks and tail bone; that "[h]er sock rubs on a nodule of the anterolateral ankle which is somewhat tender"; that her intermittent tail bone pain was an eight on a ten point scale; that she had discomfort when sitting and was most comfortable when standing; and that Vioxx caused her to become nauseous and vomit, "so she discontinued it." Dr. Ryan reported that Plaintiff was alert; that her vital signs included a blood pressure of 130/82 and pulse of seventy-eight; that a firm, tender nodule existed on the anterolateral aspect of her right ankle; that non-tender ecchymosis was resolving in the anterolateral foot and ankle; that the buttocks had diffuse purple ecchymosis; that Plaintiff's buttocks, sacrum, and coccyx

were extremely tender when palpated; that Plaintiff suffered from a contusion of the coccyx and right leg; that Plaintiff should discontinue Vioxx and continue Relafen; that Plaintiff could return to limited work duty that day; that Plaintiff could not repetitively stoop, crawl, climb or squat; that Plaintiff should alternate between sitting, standing, and walking; and that Plaintiff was restricted from driving the forklift and prolonged sitting. Tr. 281-82.

Dr. Ryan reported on July 24, 2001, that Plaintiff presented for a follow-up related to her July 10, 2001 injury and that Plaintiff was taking Relafen. Dr. Ryan's records of this date state that Plaintiff reported that she felt better; that pain continued in her tailbone "but she [was] able to sit longer than she has been before"; that her right leg occasionally felt weak "but she does not fall"; that she believed that this was "due to just standing and putting more weight on her right leg than she used to"; that her bruised right foot was doing better; that Relafen helped control the pain and made her feel dizzy or sedated; and that she has been tolerating limited duty at work. Dr. Ryan's records further state that Plaintiff was alert; that her lower sacrum and coccyx were tender when palpated; that her left buttock had ecchymosis; that Plaintiff should take Relafen and Tylenol; that Plaintiff was restricted from repetitive stooping, crawling, climbing, and squatting; and that Plaintiff should sit, stand, and walk when needed. Tr. 279-280.

On July 31, 2001, Dr. Ryan reported that Plaintiff presented for a follow-up regarding her July 10, 2001 injury and that Plaintiff was taking Paxil, Xanax, and Relafen. Dr. Ryan further reported on this date that Plaintiff stated she was feeling better and able to walk faster; that she experienced pain when she attempted to climb onto the forklift; that her pain was less intense than it previously had been when she tries to sit; and that she estimated her pain had improved fifty percent since the injury. Dr. Ryan noted that Plaintiff was alert; that Plaintiff stood during the examination; that Plaintiff had very faint ecchymosis over her left buttock; that she could rise from a squat without much

difficulty; "although she [had] some coccyx pain at the end range of flexion and extension," full range of motion was present in her lumbar spine; that Plaintiff had a coccyx contusion; that Plaintiff should continue Relafen; that Plaintiff could return to work on that date, with limited duty; that Plaintiff should alternate between sitting, standing, and walking, as tolerated; and that Plaintiff should not drive the forklift and should avoid prolonged sitting. Tr. 277.

Dr. Ryan reported on August 9, 2001, that Plaintiff presented for a follow-up regarding her July 10, 2001 injury; that Plaintiff stated that she was feeling better; that Plaintiff stated that, when seated, she had pain in the tailbone and ischial tuberosities; that Plaintiff thought that she could drive a forklift part-time "if she [could] get off of it and do other work intermittently"; that Plaintiff stated the Relafen was helping "because she has had increased pain when she ran out of it"; that Plaintiff was taking Relafen, Tylenol, Alprazolam, and Paxil; that Plaintiff had faint ecchymoses in her left buttock; that Plaintiff's ischial tuberosities and coccyx were tender when palpated; that Plaintiff had a normal gait; that Plaintiff was to continue Relafen and return to limited duty; that Plaintiff should alternate sitting, standing, and walking; and that Plaintiff could drive a forklift part-time. Tr. 274-276.

Dr. Ryan reported on August 16, 2001, that Plaintiff presented for a follow-up regarding her July 10, 2001 injury and that Plaintiff stated that she was doing better; that she was able to drive a forklift; that she experienced pain when bending, "but if she squats she doesn't seem to have any problem"; that she had recovered eighty-five percent since injury occurred; and that Relafen helped. Dr. Ryan further reported that Plaintiff appeared alert; that Plaintiff's sacrum, coccyx, and SI joints were tender when palpated; that Plaintiff experienced pain with flexion and extension; that Plaintiff had a coccyx contusion; that Plaintiff was prescribed of Relafen; and that Plaintiff should begin regular duty. Tr. 272.

On August 23, 2001, Eugene M. Mitchell, M.D., of Saint Francis Medical Center Emergency Room, reported that Plaintiff presented complaining of low back pain after lifting heavy boxes at work; that Plaintiff was taking Paxil, Macrobid, and Relafen; and that Plaintiff had a history of uterine suspension. Dr. Mitchell's assessment was that Plaintiff had no C-Spine or chest tenderness; that Plaintiff had paravertebral muscle spasms and tenderness at the L3/L4; that she had a negative bilateral straight leg raise; that Plaintiff was alert; that "sensory and motor [were] intact"; and that Plaintiff had normal gait. Dr. Mitchell reported that Plaintiff was given a back strain sheet, was prescribed Darvocet, and was told to follow-up with Dr. Ryan the following day for "work disposition." Tr. 270.

An August 23, 2001 radiology report completed by Daniel E. Harris, M.D., states that views of the lumbosacral spine showed that there was "partial sacralization of the L5 segment as it articulates with the ilium on the right"; that the transitional sacral segment had minimal loss of disc height, "which [was] likely congenital"; that there was mild facet hypertrophy and minimal spurring; that no dislocation fracture was seen; that no identified bony destructive process was identified; that there was no acute process; that there was "transitional anatomy as the fifth nonrib-bearing lumbar vertebral body articulated with the ilium on the right"; and that Plaintiff had mild multilevel degenerative changes. Tr. 271.

On August 24, 2001, Dr. Ryan assessed Plaintiff for her August 23, 2001 injury. Dr. Ryan's records of this date reflect that Plaintiff stated that her pain developed when she was lifting boxes at work; that she did not experience any pain or weakness in her legs and had no bowel or bladder dysfunction; that she had numbness in both thighs in non-dermatomal distribution; and that her back pain was eight out of ten. Dr. Ryan noted that Plaintiff was taking Relafen; that Plaintiff's vital signs included a blood pressure of 117/72 and a pulse of 101; that Plaintiff's paravertebral muscles

bilaterally in the lower back and vertebral column along the coccyx were tender when palpated; that Plaintiff had decreased range of motion; that Plaintiff had flexion of fifteen degrees, extension of five degrees, and right and left lateral bending of five degrees; that she had a negative bilateral straight leg raise; that Plaintiff's lower extremities had normal sensation and motor strength of 5/5; that her knee and ankle reflexes were 2+; and that Plaintiff could rise from a squat and walk on heels and toes without difficulty. Dr. Ryan's notes of this date also state that Plaintiff was to continue taking Relafen; that she was prescribed Norflex for muscle spasms; that it was recommended that Plaintiff ice her back, begin physical therapy, and take Tylenol; that Plaintiff should return to limited work duty; that Plaintiff was restricted from pushing, lifting, or pulling anything over fifteen pounds; that Plaintiff could engage in no "repetitive stooping, crawling, climbing or squatting" and "no repetitive bending or twisting in the back"; that Plaintiff should alternate between sitting, standing, and walking, as tolerated; and that Plaintiff's injury was "work related to a reasonable degree of medical certainty." Tr. 267-68.

Prompt Care August 29, 2001 medical records reflect that Plaintiff presented with recurring hematuria; that Plaintiff fell at work on July 10, 2001; that Plaintiff was taking "Relafen or Phenadren, Paxil [], Xanax, and Bendaryl for [an] itchy scalp"; and that a renal ultrasound and urology consult were scheduled to verify no cell carcinoma or bruised kidneys were present from her fall. Tr. 180.


The record reflects that on August 30, 2001, Dr. Ryan conducted a follow-up evaluation regarding Plaintiff's July 10 and August 23, 2001 injuries. Dr. Ryan's notes of this date state that Plaintiff reported that her back was stiff in the morning; that her back pain was a six; that she did not feel better than the previous week; that she could walk better; that Plaintiff had a prior kidney infection with some hematuria and another physician was treating Plaintiff for these symptoms; and

that the medication was working. Dr. Ryan's notes further state that Plaintiff was taking Xanax, Paxil, Relafen, Norflex, and Macrobid; that Plaintiff's lower lumbar, sacral vertebral column, and coccyx were tender when palpated; that Plaintiff had a flexion to thirty degrees, extension of five to ten degrees, and right and left lateral bending to ten degrees; that Plaintiff's straight leg raise was negative bilaterally; that she had normal sensation and motor strength in her lower extremities; that her knee reflex was 2+; that Plaintiff could rise from a squat and walk on heels and toes without difficulty; that Plaintiff had a normal gait; that Plaintiff should continue with Norflex and physical therapy; that Plaintiff should return to limited duty; that Plaintiff was restricted from lifting, pushing, or pulling anything over twenty pounds; that Plaintiff should engage in "no repetitive stooping, crawling, climbing, or squatting, no repetitive bending or twisting in the back"; and that Plaintiff should alternate between a sitting, standing, and walking, as tolerated. Tr. 265-66.

Prompt Care September 2, 2001 records reflect that Plaintiff presented with rib pain "due to falling on [the previous] Saturday and hitting a chair"; that Plaintiff's current medications included Paxil, Xanax, and Orphenailrine; that Plaintiff had a rib fracture which Dr. Compton reported seeing on an x-ray; that there was bruising in the area of the fracture; that the area was painful when touched; that Plaintiff was assessed with an eighth rib fracture; that Plaintiff was prescribed Vicodin; and that it was recommended that Plaintiff take the rest of the week off from work and that she return to light duty. Tr. 177.

Dr. Ryan's notes of September 6, 2001, state that Plaintiff was seen for a check-up in regard to her July 10, 2001 lumbar strain and her August 23, 2001 coccyx contusion; that Plaintiff was taking Xanax, Paxil, Norflex, and Vicodin; that Plaintiff stated that on the previous Saturday, she fell and fractured her rib at home and "[as] a result she has not been able to tolerate doing any Physical Therapy for her back"; that Plaintiff stated that her back was better, "although it is hard to tell

because her ribs hurt so much;" that Plaintiff had not been working due to her rib injury; and that Plaintiff said that her tailbone was sore. Dr. Ryan's notes reflect that she observed multiple contusions over Plaintiff's lower right lateral rib cage; that Plaintiff's lower paravertebral muscles in the lower lumbar area and lower lumbar vertebral bodies, sacrum, and coccyx were tender when palpated; that Plaintiff's flexion was about thirty-five to forty degrees; that her extension was ten degrees, right and left; that Plaintiff's straight leg raise was negative bilaterally; that she had normal sensation, strength, and gait; and that Plaintiff could squat and walk on heels and toes without difficulty. Dr. Ryan's assessment was that Plaintiff had a lumbar strain, a coccyx contusion, and a non-work related rib fracture. Dr. Ryan reported that Plaintiff should continue Norflex; that Plaintiff should discontinue physical therapy "until her rib pain improve[d]"; that Plaintiff should not lift, push or pull anything over twenty pounds; that Plaintiff was limited from "repetitive stooping, crawling, climbing, squatting or repetitive bending or twisting of the back"; and the Plaintiff's injuries were work related. Tr. 263-64.

Dr. Ryan reported that Plaintiff was seen on September 25, 2001, for a follow-up evaluation regarding her July 10 and August 23, 2001 injuries. Dr. Ryan's notes of this date state that Plaintiff reported that "she had good and bad days"; that she had coccyx, rib, and buttocks pain when walking; that "[her] low back pain still hurt[] but it [was] better"; that she had some hematuria and was in the middle of a work-up; that Plaintiff was scheduled for a cystoscopy the following day; that "because of to her renal problems," Plaintiff's doctor had taken her off of her anti-inflammatory and muscle relaxant medication; that she was not working or attending physical therapy "due to her rib pain"; and that she could not "undergo any treatment ... for her back problems due to other medical problems." Dr. Ryan's records also reflect that Plaintiff was taking Xanax, Paxil, and Tylenol; that her sacrum, coccyx, and paravertebral muscles bilaterally were tender when palpated; that Plaintiff's ischial

tuberosities bilaterally were tender; that Plaintiff had flexion of seventy to eighty degrees, extension

of ten degrees, right and left lateral bending of ten degrees, and a negative straight leg raise; that

Plaintiff's lower extremities had normal sensation and motor strength of 5/5; that Plaintiff's knee

reflex was 2+ and her ankle reflex was 1+; that Plaintiff could rise from a squat and walk on her heels

and toes, both without difficulty; and that Plaintiff had a normal gait. Dr. Ryan's notes also state that

her assessment was that Plaintiff had a lumbar strain; that Plaintiff should take Tylenol and use ice;

that Dr. Ryan was placing other treatments on hold; that Dr. Ryan would not schedule a follow-up

until the company nurse requested one; that Plaintiff should return to work and not lift, push, or pull

anything over twenty pounds; and that Plaintiff was restricted from repetitive bending or twisting in

the back. Tr. 251-52.

Christopher Compton, M.D., of Prompt Care, reported on September 24, 2001, that Plaintiff

presented for a follow-up regarding a rib fracture which occurred at Plaintiff's home on September

1, 2001; that Plaintiff was taking Paxil, Xanax, and TCN Cream; that Plaintiff had not returned to

work since the injury; that an x-ray from the time of the injury showed a right rib fracture; and that

Plaintiff stated that "the pain [was] much better," "some days are better than others," and that

"[o]therwise, overall thinks the pain is getting much better." Dr. Compton further reported that

bruising was observed on the lateral aspect of Plaintiff's rib; that the area of the fracture had some

tenderness when palpated "with decreased discomfort from previous exam"; and that Plaintiff would

possibly return to work on October 8. Tr. 175.

Prompt Care records of September 27, 2001, state that Plaintiff presented with upper

respiratory symptoms and that Plaintiff reported a trembling feeling "since she has been on the Paxil

but she [was] feeling better with the Paxil as far as her depression [was] concerned." Tr. 174.

Prompt Care records of October 11, 2001, state that Plaintiff presented for a follow-up evaluation regarding her rib fracture; that Plaintiff reported that the pain from the fracture had decreased; that no bruising was present; and that a "return to work form was filled out" for Plaintiff. Tr. 173.

A physical capacity evaluation form, dated October 11, 2001, states that Plaintiff could perform all of the following activities for the time period of six to eight hours: bend at waist, reach above the shoulders, drive, sit, stand, walk, and operate power tools; that Plaintiff could lift, carry, push, and pull a weight of between twenty and forty-nine pounds. This physical capacity evaluation form further states that Plaintiff could return to work. Tr. 172.

Dr. Ryan's October 16, 2001 notes reflect that Plaintiff presented for a follow-up assessment related to her July 10 and August 23, 2001 injuries and that Plaintiff reported that she had low back pain bilaterally; that she had "numbness and tingling in her left leg in the posterior calf, the sole of her foot, and the anterior thigh" which occurred primarily when seated; that she did not have weakness and bowel or bladder dysfunction; that she had pain in the tail bone and right anterior thigh; that she had "a completed workup for [her] hematuria and they were unable to determine the cause for it"; that she returned to work after her rib fracture; that she thought she could begin physical therapy; that she estimated that her back had improved fifty percent "from the time of her initial injury"; and that the previous night she had numbness "extending from her low back ... shoot[ing] all the way up to the very top of her neck to the base of her skull." Dr. Ryan reported that Plaintiff was taking Paxil, Xanax, and Relafen; that Plaintiff's paravertebral muscles bilaterally and coccyx were tender when palpated; that Plaintiff's flexion was forty-five to fifty degrees and her extension to about ten degrees; that her lateral bending was ten degrees to the right and left; that Plaintiff's straight leg raise was negative bilaterally; that she had intact sensation in her lower extremities and motor strength of 5/5;

that her knee and ankle reflexes were 2+; that, without difficulty, Plaintiff could rise, squat, and walk on her heels and toes; and that Plaintiff had a normal gait. Dr. Ryan's assessment was that Plaintiff had a lumbar strain and coccyx contusion. Dr. Ryan's notes of this date further state that Plaintiff should continue to take Relafen; that Plaintiff should resume physical therapy; that Plaintiff was to return to work that day, with limited duty; and that Plaintiff's restrictions including "no lifting, pushing, or pulling over 20 pounds" and "no repetitive bending or twisting of the back." Tr. 259-60.

Dr. Ryan's October 25, 2001 notes state that Plaintiff presented for a follow-up examination in regard to her July 10 and August 23, 2001 injuries and that Plaintiff was taking Paxil, Xanax, and Relafen. Dr. Ryan reported on this date that Plaintiff stated that therapy was helping; that she was feeling better; that Relafen was not helping "although she is not taking [its] therapeutic dose"; that Relafen caused diarrhea; that she had rib pain and no lower extremity symptoms; and that "she ha[d] been working on limited duty but [complained] that this was painful to her." Dr. Ryan noted that Plaintiff's paravertebral muscles bilaterally, her vertebral column in the lumbar, and her sacral and coccyx regions were tender when lightly palpated; that Plaintiff had thirty degrees of flexion, five degrees of extension, and ten degrees of right and left lateral bending; that her straight leg raise was negative bilaterally; that her lower extremities had intact sensation and motor strength of 5/5; that her ankle and knee reflexes were 2+; that, without difficulty, Plaintiff could rise from a squat and walk on her heels and toes; that Plaintiff had a lumbar strain and coccyx contusion; that Plaintiff should stop taking Relafen and begin taking Lodine; and that Plaintiff was restricted from lifting, pushing or pulling anything over twenty pounds and from bending or twisting her back. Tr. 257-258.

K. Casleet, C-FNP, of Prompt Care, reported on October 30, 2001, that Plaintiff presented with back pain and "because she [was] frustrated [with] having back pain"; that Plaintiff stated that

"she continues to have back pain" and "would prefer to see Dr. Icaza in AM for an evaluation"; and that Nurse Practitioner Casleet did not examine Plaintiff. Tr. 171

Prompt Care records of October 31, 2001, state that Plaintiff was "disgusted and frustrated" because of continued back pain; that Plaintiff had been treated by Dr. Ryan, a disability physician; that an x-ray of back was performed "but [Plaintiff] has stated she continued to have pain in spite of physical therapy"; that Plaintiff had a right rib-cage area anteriorly fracture "not related to her initial buttock trauma at work"; that Plaintiff stated that she did not have therapy for five weeks; that Plaintiff stated she was "really tired of having a lot of pain"; that Plaintiff had intermittent numbness sensation in her lower extremities; and that Plaintiff did not report having focal neurological weakness and muscle wasting or deformity. Records of this date also reflects that Plaintiff patella reflexes were "normal 2 plus"; that Plaintiff had good strength bilaterally and a negative Homan's sign; that Plaintiff had "some pain on her lower back by lifting her right leg"; and that a CT of the lumbar spine, a heating pad, Vioxx and Ultracet were recommended. Tr. 169-70.

Dr. Ryan's records, dated November 1, 2001, state that Plaintiff presented for a follow-up examination in regard to her July 10 and August 23, 2001 injuries and that Plaintiff was taking Lodine, Paxil, and Xanax. Dr. Ryan's records of this date further state that Plaintiff reported that her pain was worse during this visit; that her employer required her to do more bending, twisting and lifting at work; that she left work early the previous day "due to increased back pain"; that she noticed intermittent numbness in her right leg while driving and when her legs hang over a chair or examination table; that her current pain was a six; that physical therapy was helping her to improve; that she had no bowel nor bladder dysfunction and no weakness in her extremities; and that she would rather be driving a forklift than doing light duty. Upon examination Dr. Ryan reported that Plaintiff's paravertebral muscles were tender when palpated on both-sides; that she had a negative bilateral

straight leg raise; that Plaintiff had a flexion from five to ten degrees, which was greater when she squatted, ten degrees of extension, and ten degrees of right and left lateral bending; that Plaintiff's lower extremities had normal sensation and motor strength of 5/5; that her ankle and knee reflexes were 2+; and that she had a normal gait and could walk on her heels and toes without difficulty. Dr. Ryan's assessment was that Plaintiff had lumbar strain and coccyx contusion. Dr. Ryan further reported that Plaintiff should continue Lodine and physical therapy; that Plaintiff was to return to regular duty on that day, "but [was] to operate a forklift only." Tr. 255-56.

Dr. Ryan reported on November 12, 2001, that Plaintiff stated that her back was doing better; that she was in more pain on the day of the visit than the previous few days; that she was experiencing soreness in her tailbone; that physical therapy was helping; that working on the forklift helped her; and that no numbness, tingling or weakness was present in her legs. Dr. Ryan's assessment on this date was that Plaintiff had a lumbar strain and coccyx contusion. Dr. Ryan further reported that Plaintiff should take Lodine and continue physical therapy and that she could only drive a forklift at work. Tr. 254-55.

Dr. Ryan's November 15, 2001 office notes reflect that Plaintiff reported that her legs went numb after sweeping the floor all night, that her back pain increased, and that she left work early; that she rated her current back pain at an eight on a ten point scale; that she had previously experienced numbness and tingling in her leg; that her legs did not currently have any numbness or tingling; that a sharp pain was present in her lateral right leg that extended all the way to the ankle; that she wanted respite from work for four to five weeks to heal; and that Plaintiff had not attended any physical therapy since her last check-up. Dr. Ryan further reported on this date that she reminded Plaintiff that her several weeks' respite following a rib fracture did not improve Plaintiff's pain; that Plaintiff's medications were Paxil, Xanax, and Lodine; that Plaintiff was alert; that Plaintiff's coccyx,

paravertebral muscles bilaterally, and lumbar vertebrae were tender when lightly palpated; that her straight leg raise was negative bilaterally; that her lower extremity sensation was intact, her lower extremity muscle group motor strength was 5/5 and her ankle and knee reflexes were 2+; that Plaintiff had fifteen degrees of active flexion, five degrees of extension, and five degrees of right and left bilateral bending, "however, she can flex much, much more when she squats and gets back up"; and that Plaintiff had a normal gait and, without difficulty, Plaintiff could walk on heels and toes. Dr. Ryan's note also state that Plaintiff had lumbar strain and coccyx contusion; that Plaintiff should continue on Lodine and physical therapy; that Plaintiff should have an spinal MRI; and that Plaintiff should return to work and only perform forklift work. Tr. 251-52.

Theodore R. Swartz, M.D., reported on November 23, 2001 that a lumbar MRI was performed on Plaintiff at Saint Francis Medical Center; that Plaintiff had no intervertebral disc space narrowing; that L1-L2 and L2-L3 were normal; that L3-L4 had concentrive compressive disc bulge and degenerative facet joint hypertrophy, both of which were mild, and "[t]he neural formina, lateral recosses and central canal were parent [sic]"; that L4-5 had both mild concentric noncompressive disc bulge and mild degenerative facet joint hypertrophy; that degenerative facet joint disease was present bilaterally; that no herniated nucleus pulposus were evidenced that L4-5 had mild desiccative change without intervertebal disc space; that a mild noncompressive concentric disc bulge was present at L3-4 and L4-5; and that there no stenosis involving neural foramina, lateral recesses or central canal was evidenced. Tr. 249-50, 408-409.

Dr. Ryan's records, dated November 27, 2001, reflect that Plaintiff presented with low back pain and that Plaintiff said her low back pain was five out on a scale of one to ten; that her pain was in the low back and buttocks; that she had numbness in her legs with long period of sitting; that she had been placing items in a ten pound box; that she had not been driving a forklift; and that Plaintiff

reported no bowel or bladder dysfunction. Dr. Ryan reported that Plaintiff was "very angry and tense throughout the entire visit"; that across Plaintiff's entire lumbar area, tenderness was present when lightly palpated; that Plaintiff's lower extremities had normal sensation and motor muscle strength of 5/5; that her knee and ankle reflexes were 2+; that Plaintiff had forty-five degrees of flexion and five to ten degrees of extension that was more painful than flexion; that Plaintiff could perform bilateral side bending to about ten degrees; that Plaintiff could rise from a squat and walk on heels and toes without difficulty; and that Plaintiff had a normal gait. Dr. Ryan's notes also state that Plaintiff's physical therapist reported that Plaintiff had reached maximum medical improvement and that Dr. Ryan believed that stress played a role in the back pain and that Plaintiff should access the Employee Assistance Program. Tr. 247-48.

Dr. Compton's January 24, 2002 records reflect that Plaintiff requested, and was given, a refill of her Xanax prescription. Tr. 168.

January 30, 2002 records from Prompt Care reflect that Plaintiff complained of a chest cold and sinus congestion; that Plaintiff reported that she smokes one pack of cigarettes a day; that Plaintiff's lungs were "essentially clear"; and that Plaintiff was prescribed Azmacort, Combivent, and Allegra 180. Tr. 165.

Plaintiff sought assistance from Workmen's Compensation Emergency Services on February 15, 2002, for a fall at work that injured her right elbow. Tr. 244.

A February 16, 2002 radiology report prepared by Daniel E. Harris, M.D., of Saint Francis Medical Center, states that two views were taken of Plaintiff's left shoulder after a fall; that Plaintiff had "mild degenerative change about the acromioclavicular joint"; that a "nondisplaced fracture involving the greater tuberosity of the humerus" was present and seen only on the oblique image; and that no other fractures, dislocations, or destructive processes were identified. Dr. Harris's report also

reflects that two views were taken of the left elbow and that no fracture, subluxation or osteolytic process were present. Tr. 404-405.

A February 18, 2002 letter from David R. Lange, M.D., of St. Louis Orthopedic Institute, Inc., to Travelers Insurance Company states that Dr. Lange conducted an independent evaluation of Plaintiff. Dr. Lange's report states that Plaintiff said during the examination she was "definitely feeling better than she was back in July"; that she still had discomfort in the sacrum; that she was performing her usual job as a forklift driver; that she had switched to an electric forklift "which has a smoother ride"; that she has difficulty climbing onto the forklift due to its height; that Plaintiff believed this "kep[t] her sacrum flared up"; that she did not have "referred or radiating symptoms" in the lower extremities; that she did not have paresthesias; and that she had discoloration near the right ankle. Dr. Lange further reported that Plaintiff's neurologic exam appeared normal; that her straight leg raise was normal; that Plaintiff had neither back deformity nor spasms; that Plaintiff's "range of motion was rather limited from a subjective point of view"; and that Plaintiff noted discomfort over the sacrum during range of motion and tenderness "to fairly light touch directly over the caudal sacrum." Dr. Lange's report also states that the records available to him "suggest that direct trauma [had occurred] to the sacral area" which was "substantiated by significant ecchymosis locally"; that Plaintiff had "residual symptoms directly over the sacrum"; that Plaintiff reasonably had contusion of the sacrum and "potentially" of the sacroccygeal joint; that the sacrum contusion would heal quickly and spontaneously; that the sacroccygeal junction pain could remain for several months; that Plaintiff's symptoms gave rise to the conclusion that Plaintiff suffered an injury to the sacrococcygeal junction; that Plaintiff did not require further medical treatment beyond anti-inflammatory medications; that Plaintiff did not require further restrictions "[o]ther than common sense in regard to avoiding direct trauma to the area"; that "any permanency would have to be

23

predicated purely on her subjective complaints and hypothesized diagnosis since there [was] nothing particularly objective about [Plaintiff's] presentation, imaging studies, etc"; that "any permanency would be a fraction of one percent"; that Plaintiff had reached maximum medical improvement; that Plaintiff also complained of a fractured rib from a fall at home; Plaintiff "was just recently getting over [the fractured rib] when [] she had another fall at work"; that Plaintiff claimed she had a fracture in her left shoulder from the recent fall at work; and "that [i]f it were not for this fracture, certainly she should be working at her usual duty as a forklift operator." Tr. 288-89.

Records from Orthopaedic Associates, P.C., reflect that on February 19, 2002, R. August Ritter, M.D., saw Plaintiff for an injury to her left shoulder which injury occurred on February 15, 2002; that Plaintiff's medical history was negative for, among other things, "depression, osteoarthritis, back pain, [or] rheumatoid arthritis"; that Plaintiff's previous hospitalizations were for childbirth; that Plaintiff smoked two packs of cigarettes and consumed alcohol on a daily basis; that physical examination showed that Plaintiff "had localized ecchymosis around the triceps and medial elbow region consistent with a direct blow to that area"; that the ecchymosis was present near the left shoulder; that Plaintiff's left shoulder and left elbow were painful when palpated; that she had "good elbow ROM on active exam"; that the range of motion in Plaintiff's shoulder was not examined; that no bony abnormalities in her elbow were indicated on an x-ray; that Plaintiff had a nondisplaced greater tuberosity fracture in her left shoulder; that Plaintiff should continue to wear a sling and not use the injured arm; and that Plaintiff should take Darvocet. Tr. 295.

A February 22, 2002 office note from Prompt Care reflects that Plaintiff had discoloration on her left shoulder, left humerus, and left elbow; that tenderness was present in Plaintiff's internal and external elbow rotation; and that the examiner recommended Plaintiff use a brace, follow-up with Dr. Overstreet, and continue to take Ultracet, Paxil, and Xanax. Tr. 168.

Dr. Ritter reported on February 26, 2002, that Plaintiff presented for a follow-up appointment; that Plaintiff complained of new left hip pain since her fall; that ecchymosis was present in Plaintiff's left arm and left buttock area; that pain was present in Plaintiff's greater trochanter, "but [she was] able to do single leg stance [without] difficulty or pain"; that x-rays revealed no abnormalities present in her left hip; that x-rays revealed that Plaintiff's greater tuberosity fracture was healing well; that it was recommended that Plaintiff begin a "PROM" program and not use her arm at work; and that Plaintiff was not restricted with regard to her hip. Tr. 294.

Prompt Care March 18, 2002 office notes reflect that Plaintiff sought treatment for a fracture to the left greater tuberosity of the left humerus; that Plaintiff was being treated by orthopedics; that Plaintiff would attend physical therapy; and that Plaintiff "had good radial pulses." Tr. 168.

Dr. Ritter's March 19, 2002 notes reflect that Plaintiff presented with no new complaints; that Plaintiff's PROM was "quite good, as documented in [Plaintiff's] therapy note"; that there was no sign of new problems on physical exam; that an x-ray revealed that Plaintiff's greater tuberosity fracture in anatomic alignment was healing "w/o sign of problem"; and that Plaintiff was "far enough out to be at full ROM, AROM and strengthening at physical therapy 3 times a week for 3 weeks." Tr. 293.

Dr. Compton reported on March 25, 2002, that Plaintiff complained of low back pain; that Plaintiff stated that the previous Friday she "was doing a lot of twisting and lifting and probably aggravated [her back]"; that Plaintiff reported that Vicodin makes her sleepy; that Plaintiff complained of occasional numbness in her buttocks; that Plaintiff reported that her pain worsened with movement and improved with no movement; that Plaintiff denied having any straight leg raise, fever or chills, bladder or bowel dysfunction, and pain waking her up at night; that Plaintiff's blood pressure was 116/74; that Plaintiff displayed slight discomfort with movements; that her HEENT,

heart, and lungs were normal; that there was no visible bruising on the lumbar back; that, on examination, Plaintiff's SI joint was tender when palpated; that her spinal process indicated no tenderness; that no paraspinal tenderness was present in the lumbar spine; that Plaintiff "had negative straight leg raises"; that her lower extremity reflexes and strength in her knees and hip were normal; that she had intact sensation; that she "was able to do ... deep knee bend without any discomfort"; that Plaintiff would continue on Vioxx and Vicodin, as needed, for pain, and begin Skelaxin, a muscle relaxant; and that a lumbar back MRI would be scheduled. Tr. 164.

Records of Dennis J. Straubinger, D.O., dated March 25, 2002, reflect that Plaintiff was being seen on that date for an "initial corporate evaluation of low back pain" and that Plaintiff complained of low back pain associated with a March 22, 2002 injury. Dr. Straubinger further reported on this date that Plaintiff said she was on Vicodin, Darvocet N, Paxil, Xanax, and Thyroidal; that while at work she was using her right hand; that her left hand was in a sling "due to a shoulder problem"; that the reason for "her problem on 03/22/02 was she was trying to feed two machines at the same time"; that usually she does not feed two machines at the same time; that while at work she began "increasing low back pain"; that this pain caused her to present in the emergency room on March 22, 2002; that she received an injection of Demerol and Vistaril IM, and given Vicodin ES; that her back pain began approximately on July 1, 2001; and that a doctor offered to perform surgery. Dr. Straubinger's notes of this date also state that Plaintiff could walk on heels and toes for ten feet without difficulty; that Plaintiff could recover from a half knee squat; that her pain was "sacral to low sacrum in the coccyx"; that she had equal motor strength in both lower extremities; that she had no quadrant tenderness; that she had a negative heme screens times two; that Plaintiff should continue with Vioxx and avoid narcotics; that she should use alternate positions and postures; and that she was restricted from pushing or pulling anything over thirty pounds. Tr. 243.

A Prompt Care March 28, 2002 note states that Plaintiff informed Prompt Care that her employer would not cover her injury under Workmen's Compensation "so she [was] not going to have MRI done." Tr. 164.

On April 3, 2002, Dr. Straubinger reported that Plaintiff presented in regard to her March 22, 2002 injury; that Plaintiff said she was not working and that her last day of work was April 1; that she stated that she felt better "having not worked for those days"; that Plaintiff's pain from the March 22, 2002 injury was "transsacral in nature and without radiation"; that an MRI dated November 23, 2001, did not indicate herniation or arthritis; and that Plaintiff's "[m]echanism of injury as of March 22, 2002, is non-high velocity, no impact, no fall, it [was] just twisting"; that Plaintiff had an "unusual clinical presentation"; that there were "inconsistencies to her examination"; that Plaintiff was jumpy and shaky; that in a standing position, Plaintiff "only flex[ed] to 30 degrees, however, she can sit on the examination [table] with her legs outstretched with the trunk to the legs flexed at 85 to 90 degrees;" that Plaintiff had a negative Lasegue's test; that Plaintiff had less pain on flexion than she did on extension; that Plaintiff's "ambulation pattern [was] normal when she [was] not observed"; that Plaintiff's MRI revealed positive arthritis on a facet joint and no radicular feature; that the current injury did not aggravate her chronic coccygeal; that Plaintiff was to discontinue Xanax and take Discalced; that she knew not to take Vicodin while at work; that she should use warm moist heat and stretching exercises; and that she could not lift, push or pull anything heavier than twenty pounds and could do no repetitive bending or twisting of the back. Tr. 240-41.

Dr. Ritter's records dated April 9, 2002, reflect that Plaintiff presented with no new complaints related to her shoulder; that Plaintiff said she had "a new back injury ... [which] occurred on March 22, 2002," when she operating two machines with a single arm; that her low back pain had since increased; that "on further questioning, [Plaintiff] [] change[d] her story to that of an injury that

she [said] occurred in July of 2001 when she fell at work while standing on rollers on a conveyor line"; and that Plaintiff first claimed she had no previous imaging, "however, after further questioning admit[ted] that she had previous x-rays in the ER and CT scans." Notes of this date further state that Plaintiff reported that she had been on limited work duty since July 2001; that her pain improved with a heat pad and massage; that she experienced intermittent numbness in her left leg; and that she smoked two packs of cigarettes and consumed alcohol daily. Dr. Ritter's notes further state that there was "significant evidence of pain magnification behavior with worsening of pain with axial loading of her spine or with rotation of the spine from the level of the trochantero"; that pain existed in Plaintiff's tranchanters, buttocks, and lumbar spine "diffusely without localization with no muscle guarding or palpable muscle spasm"; that by forward bending, Plaintiff could touch the proximal third of her tibia; that her straight leg raise was negative bilaterally; that the range of motion in her shoulder had improved; that lumbar spine x-rays were normal; that Plaintiff had "no particular limitation in regards to her back"; that Plaintiff did have limitations in regard to her shoulder; and that Plaintiff should continue physical therapy for her shoulder. Tr. 292-93.

Dr. Straubinger reported on April 12, 2002, that Plaintiff presented for a follow-up regarding her March 22, 2002 injury; that Plaintiff was taking Paxil, Xanax, and Discalced; that Plaintiff stated that the Discalced was helping; that Plaintiff said that she drinks six beers to assist in her sleeping; that Plaintiff had been using warm moist heat; that Plaintiff stated she was on modified work duty and was laid off of work for the previous four days "due to slow work and due to her restrictions"; that Plaintiff "[was] the historian"; that an MRI dated November 23, 2001, indicated degenerative osteoarthritis and no herniations; and that Plaintiff stated that she was undergoing therapy for her shoulder. Dr. Straubinger reported on this date, pursuant to physical examination, that Plaintiff's SI joints demonstrated slight focal tenderness; that Plaintiff had increased pain on extension in her

twenty degrees of extension and full flexion; that Plaintiff had normal ambulation; and that her "[m]otor strength, lower extremities, and manual muscle testing [were] 5/5." Dr. Straubinger also reported that his diagnosis was that Plaintiff had a "[t]ranssacral low back pain, strain" and degenerative arthritis at the baseline; that Plaintiff had reached maximum medical improvement; that Plaintiff should decrease her alcohol intake; that he recommended Plaintiff see Employee Assistance Program; that Plaintiff was released at work from the March 22, 2002 injury; that he was not placing Plaintiff on any restrictions as a result of that injury; and that restrictions placed by other doctors are still in affect. Tr. 238-39.

Dr. Ritter's records of April 29, 2002 reflect that Plaintiff presented for reevaluation of her lumbar spine and left shoulder; that Plaintiff reported that her back was "a lot better"; that the range of motion in Plaintiff's shoulder had improved; that Plaintiff's strength had increased "significant[l]y ... although still mostly only 4+"; that Plaintiff should remain on light duty and not engage in "work over shoulder high limit"; that Plaintiff should continue shoulder therapy; that Plaintiff did not need to continue lumbar spine rehabilitation; that her range of motion was excellent; and that she "generally appear[ed] to be doing well on [ROM] exam" that day. Tr. 291-292.

Dr. Ritter reported on May 20, 2002, that the range of motion in Plaintiff's shoulder had significantly improved; that Plaintiff had full range of motion in her lumbar spine; that Plaintiff's strength was good, "although she still [had] fairly systemic complaints of shoulder, low back and bilateal [sic] buttock pain"; that Plaintiff could return to full activities; and that Plaintiff would be considered to be at maximum medical improvement if no new problems arose. Tr. 291.

A July 1, 2002 office note from Prompt Care reflects that Plaintiff reported having low back pain; that her back "ha[d] never been completely back to normal ever since hurting it at work"; that she had returned to work; and that she injured her back on the previous Saturday at work when lifting

some racks.  Notes of this date further state that Plaintiff was well-nourished and under no acute distress; that Plaintiff was able to move without difficulty; that an examination of her lower back revealed no bruising, no swelling, or tenderness over the left lumbar spine; that the most tenderness was indicated right sacral iliac joint; that Plaintiff had a negative straight leg raise; that Plaintiff's lower extremities had normal sensation, strength, and reflexes; and that Plaintiff would continue to work. Tr. 160.

Dr. Ryan's records of July 2, 2002, state that Plaintiff reported that on June 29, 2002, she injured her back while lifting metal racks from the floor for her entire eight hour shift; that she noticed the low-back pain the following day; that on July 1, 2002, Plaintiff's personal physician prescribed Celebrex, Skelaxin and Darvocet for her low-back pain; that she had not taken the drugs; that pain existed in her low-back and buttocks and radiated down into the right hip; that she had no numbness, tingling or weakness in her legs; that the pain was constantly burning, stabbing, and aching; that she could not sit for a long time; that the pain increased when she sat, extended her back, walked up hills and climbed stairs; that she relieved her pain by lying down and standing; and that she had four work-related injuries in the previous year that began when she fell and landed on her tailbone.  Dr. Ryan reported on this date that Plaintiff had no current depression; that Plaintiff smoked a pack and a half of cigarettes a day and drank five to six beers a night; that Plaintiff lost ten pounds; that Plaintiff had no visible deformities; that Plaintiff's range of motion was approximately seventy degrees in flexion, ten degrees in extension, and ten degrees in right and left lateral bending; that her rotation was good with mild discomfort; that there was no pain in axial loading; that she had an intact simple touch; that in her lower extremity muscle group she had motor strength of 5/5; that her knee and ankle reflexes were 2+; that she could rise from a squat  and walk on her toes and heels without difficulty; that Plaintiff had a normal gait; that Plaintiff had lumbar strain; that she should take Celebrex, Skelaxin,

ice her back, and continue her regular activities; that Plaintiff was restricted from lifting, pushing, or pulling anything over thirty pounds, as well as "[r]epetitive or twisting in the back"; and that Plaintiff's injury was "believed to be work related with a reasonable degree of medical certainty based on the history provided." Tr. 236-37.

Dr. Ryan's records dated July 9, 2002, reflect that Plaintiff presented in regard to her June 29, 2002 injury and that Plaintiff told Dr. Ryan that her pain in the back and buttocks continued; that she did not sleep well; that her pain was currently at a seven; that she only took "one Skelaxin at a time rather than the full two pill dose"; that her medications helped, "but on the other hand there ha[d] been no significant improvement from last week"; and that her pain increased when she sat for long periods of time. Dr. Ryan reported on this date that Plaintiff's blood pressure was 118/68; that her paravertebral muscles bilaterally were tender when palpated; that no palpable spasms were present; that Plaintiff's straight leg raise was negative bilaterally; that her approximate range of motion included seventy degrees of flexion, ten degrees of extension, and ten degrees of right and left lateral bending; that Plaintiff's sensation in her lower extremities was intact; that she had motor strength of 5/5; that her reflexes were 2+ and 1+; that Plaintiff could rise from a squat and walk on her heels and toes without difficulty; that she was restricted from lifting, pushing or pulling anything over thirty pounds; and that she was restricted from repetitively bending or twisting her back. Tr. 234-235.

Records of Health South in Cape Girardeau reflect that Plaintiff received physical therapy under the direction of Wendall Nall, PT, commencing July 15, 2002. Physical therapy notes of this period state, among other things, that during the July 15, 2002 session Plaintiff exhibited "mild atypical pain behavior in response to therapeutic activity"; that on July 19, 2002, Plaintiff attended physical therapy "with the smell of ETOH on breath and person"; that on that date Plaintiff's

"[a]ctions [were] slow and uncoordinated [sic] and [Plaintiff] ha[d] difficulty following some direction"; that on July 24, 2002, "[f]air compliance with oulined [sic] home exercise program [was] exhibited"; that during a July 30, 2002 therapy session the therapist observed Plaintiff "transferring to floor from mat [] with no trouble" and she "went from a prone position, jumped down from the table and walked away with no observed difficulties"; that on July 31, 2002, Plaintiff "ma[de] transfers and transitional movements quickly at times with little regard to getting up maintaining a neutral"; that also during July 31, 2002 therapy Plaintiff was "[o]bserved moving quickly from table to floor (prone to standing) in a quick unrestricted motion"; that on July 31 the "Pacing of Activities" was "Inconsistent"; (Tr. 343, 345-346); that during August 7, 2002 therapy Plaintiff "move[d] about the clinic [] with little difficulty," and "[s]how[ed] no guarding and no overt outward pain behaviours [sic] indicating pain limiting her active motions"; that during August 8, 2002 physical therapy Plaintiff exhibited "[a]typical pain behavior"; that on August 8, 2002, the therapist "observed active lumbar ROM during re-eval and transfers [which did] not correlate for some reason or another with c/o Oswestry"; that on August 8, 2002, Plaintiff's "[m]otions [were] smooth, painless" and Plaintiff was observed "entering & exiting car today that sets relatively low to the ground without hesitation, without guarding in a timely manner & with little difficulty"; and that on August 8, 2002, Plaintiff's "[s]it/stand transfers [were] smooth and easily performed w/o c/o pain." Tr. 297-335.

Dr. Ryan's July 17, 2002 notes reflect that Plaintiff stated that she had continued to have low-back pain; that her pain was a six on a ten point pain scale; that she had pain after therapy sessions; that she had no leg pain; that she had numbness in the legs only when her feet dangled; that Skelaxin did not help her and made her feel "dopey"; that she was on limited work duty; and that she was not sure that Celebrex helped her symptoms. Dr. Ryan reported on this date that Plaintiff's paravertebral muscles bilaterally were tender when palpated; that Plaintiff's straight leg raise resulted in a negative

bilaterally; that her range of motion included "flexion to about 60 degrees, extension 5 degrees, right and left lateral bending about 5 degrees"; that flexion and extension caused her pain; that Plaintiff had intact sensation in the lower extremities; that she had motor strength of 5/5 in the lower extremities; that her knee and ankle reflexes were 2+; that Plaintiff could rise from a squat and walk on heels and toes, all without difficulty; that she had a normal gait; that for her lumbar strain, Plaintiff should continue to take Celebrex and discontinue Skelaxin; that Plaintiff should not lift, push or pull anything over thirty pounds; and that she should not repetitively bend or twist her back. Tr. 232-233.

Records of July 25, 2002, from Dr. Ryan reflect that Plaintiff told Dr. Ryan that she had good and bad days and that she was taking ibuprofen; that Dr. Ryan "advised her not to do that and to take Tylenol instead"; that Plaintiff said she had reduced her Celebrex to one a day, which ended her diarrhea; that Plaintiff estimated her pain level was five out of ten; that when Plaintiff was palpated bilaterally, she had some pain in the paravertebral muscles; that Plaintiff had a negative straight leg raise bilaterally; that her lower extremities had intact sensation and had a motor strength of 5/5; that Plaintiff's reflexes were 2+ in the knees and ankles; that Plaintiff's range of motion included "flexion to about 45 degrees, extension 10 degrees, [and] right and left lateral bending about 10 degrees"; that Plaintiff had a normal gait, could walk on heels and toes, and rise from a squat without difficulty; and that Plaintiff could not lift, push or pull anything over thirty pounds. Tr. 230.

Prompt Care July 31, 2002 notes state that Plaintiff reported for a respiratory infection and that she was diagnosed with bronchitis and tobacco dependence. Tr. 158-159.

Dr. Ryan's August 1, 2002 office notes state that Plaintiff presented with low back pain and that Plaintiff reported that her back was feeling better; that physical therapy was helping her back "overall"; that Celebrex was helping; that she approximated a forty percent improvement since her injury; that her pain was a five on a ten point scale; that Plaintiff "had a couple episodes of 'electric

shock' pain down her left leg to her toes but this [was] a brief momentary sensation"; that she had

no leg pain, numbness, tingling, or leg weakness, and no bowel or bladder dysfunction. Dr. Ryan

reported on this date that Plaintiff had no tenderness when palpated, a negative straight leg raise, and

sensation in the lower extremities; that her lower muscle extremity group's motor strength was 5/5;

that Plaintiff's reflexes were +2 at the knees and +1 at the ankles; that her range of motion included

"flexion to about 60-70 degrees, extension 5 degrees, right and left lateral bending about 5 degrees";

that Plaintiff had a normal gait and, with no difficulty, could rise from a squat and walk on her toes

and heels; and that Plaintiff had a lumbar strain and should continue on Celebrex and physical therapy.

Tr. 228.

Dr. Ryan's office notes of August 8, 2002, state that Plaintiff presented with low back pain

from her June 29, 2002 injury and that Plaintiff reported that her pain was a five, "but state[d] it was

4 on a 10-point scale before her PT visit"; that her pain was in the back and hips; that medicine was

not helping; that she did not have any leg pain, numbness, tingling or weakness nor any bowel or

bladder dysfunction; that she approximated a seventy to eighty percent recovery from her initial

injury; that her physical therapy was going well; that she was working on a forklift; and that she had

lifted several boxes and had no soreness.  Dr. Ryan reported on this date that Plaintiff had no

palpation tenderness; that her straight leg raise was negative bilaterally; that she had normal strength

and sensation in her lower  extremities; that Plaintiff had ankle and knee reflexes at 2+; that Plaintiff

had  "flexion to about 90 degrees, extension 10 degrees, [and] right and left lateral bending 10

degrees"; that Plaintiff could, without difficulty, rise from a squat and walk on heels and toes and

right; that Plaintiff had a lumbar strain; that Plaintiff could return to limited duty on that date, with

no lifting, pushing or pulling over thirty pounds; and that Plaintiff should continue physical therapy

and Celebrex. Tr. 226-27.

Physical therapy notes state that on August 12, 2002, Plaintiff tolerated therapy with "minimal complaints of pain and difficulty"; that on August 13, 2002, Plaintiff stated "that her sex causes some extra pain" and that the prior "time she reported no restriction with this"; that Plaintiff exhibited an inconsistent pacing of activities in that "some tasks she performed in a timely fashion with no restrictions in movements and with no complaints of pain, while at other times exercises that involve the exact same lumbar motion cause her to be cautious and guarded with motions"; that on August 14, 2002, Plaintiff had "minimal complaints of pain and difficulty"; that on August 15, 2002, Plaintiff said "that pain killers only g[a]ve her moderate relief from pain yet states on Oswestry that her sex life is normal and causes her no extra pain"; that these "are behaviors that ... do no correlate"; and that "some [of Plaintiff's] transfers [were] slow and some movement patterns [were] guarded, and some movement patterns that involve[d] the same spinal and lumbar movements [were] spontaneous and without hesitation. Tr. 315-34.

Office notes of August 15, 2002, from Dr. Ryan reflect that Plaintiff presented in regard to her June 29, 2002 injury and that Plaintiff told Dr. Ryan that her pain was a five on a ten point scale; that her pain in the lower back radiates when walking up hills; that she maintained her interests; that she lost weight and had a good appetite; that she had difficulty sleeping and concentrating; and that she has good concentration. Dr. Ryan reported on this date that Plaintiff denied depressive mood; that she moved easily around the examination room and up onto the table; that palpation showed no tenderness; that Plaintiff's straight leg raising was negative and she had in-tact sensation in the lower extremities; that Plaintiff's motor strength in the lower extremities was 5/5; that she had flexion at seventy-five degrees, reflexes at 2+ for the knees and ankles, and ten degrees for right and left lateral bending; that Plaintiff could rise from a squat and walk toe to heel without difficulty; that she had normal gait; and that Plaintiff was approaching maximum medical improvement. Tr. 224.

An August 16, 2002, discharge summary from physical therapy states that Plaintiff could walk a half mile; that her recreational capacity was mildly limited; that, in regard to flexibility, Plaintiff had slight restrictions in the hamstrings, full excursion with no deficits in the hip external rotators, slight restriction in the iliopsoas, and full excursion with no deficits in the quadratus lumborum; that, in regard to the sacrum, her backward and forward bending were normal; and that Plaintiff's range of motion, active lumbosacral, was 80% in extension, 75% in flexion, 75% in side bending left, and 80% in side bending right. The August 16, 2002 discharge summary further states that Plaintiff reported an "Oswestry of 28% whereas two days previously she reported a score of 32%. The only difference being in the perception of how pain effects her sex life with her now reporting no restriction." Tr. 315-16.

Dr. Ryan's August 22, 2002 office notes state that Plaintiff presented for a follow-up in regard to her June 29, 2002 injury and that Plaintiff stated she was feeling "a little bit better" and was doing her home exercises; that her pain was a four on a ten point scale; that her pain had been at this level for several weeks; that she could be distracted from her pain when she was busy; and that she was working with little difficulty. Upon physical examination, Dr. Ryan reported that Plaintiff was alert, oriented and in no acute distress; that there was some tenderness over Plaintiff's left lateral sacrum; that Plaintiff had bilateral negative straight leg raise, flexion of ninety degrees, extension of ten degrees, right and left lateral bending at ten degrees, 5/5 motor strength in the lower extremities, knee and ankle reflexes of 2+, normal sensation in lower extremities, could rise from squat and walk on heels and toes without difficulty, and had a normal gait; that Plaintiff had a lumbar strain; that Plaintiff could return to regular duty on that date; that Plaintiff had reached maximum medical improvement; and that her case was closed. Tr. 222.

A September 11, 2002 note from Prompt Care reflects that Plaintiff reported that for several weeks she had been experiencing pain in her low back SI joint bilaterally; that Plaintiff claimed Workmen's Compensation; and that Plaintiff had "probable sacral ileitis." Tr. 157.

On October 7, 2002, Plaintiff presented to the emergency room for low back-pain with radiation to her bilateral hips and reported injuring her back "Fri noc." The records reveal that Plaintiff's medications included Bextra, Paxil, Soma, and Xanax; and that she estimated that her pain was rated at a six. Tr. 221.

Records reflect that Plaintiff was seen by Dr. Ryan on October 10, 2002, for a work-related injury which occurred on October 5, 2002. Dr. Ryan reported on this date that Plaintiff said she could relieve her pain by lying on her side and that she can sit for ten to fifteen minutes, stand for fifteen minutes, walk one quarter of a mile, and lift twenty pounds. Dr. Ryan further reported on this date that Plaintiff smoked a pack and a half of cigarettes and drank six beers a day; that she had some tenderness over the hip and sacroiliac joints; that she did not have any tenderness or spasms over the vertebral point; that with pain, Plaintiff's range of motion included flexion of seventy degrees, extension of ten degrees, and right and left lateral bending of ten degrees; that without pain, Plaintiff could do left and right rotation of about five degrees and her knee and ankle reflexes were about 2+ degrees; that Plaintiff could squat with pain; that Plaintiff could walk on her toes and heels without difficulty, and had no positive Waddell signs; that Plaintiff had bilateral sacroiliac joint strain; and that Plaintiff was to take Celebrex, discontinue Fioricet, and begin physical therapy. Tr. 220.

Records from Health South, dated October 18, 2002, reflect that Plaintiff resumed physical therapy on this date; that Plaintiff's diagnosis was a bilateral spine and sprain/strain in the sacroiliac region; that Plaintiff found "activities such as a personal care [were] painful...and that she [could] only lift light objects." Tr. 313-14.

Dr. Ryan reported on October 22, 2002, that Plaintiff presented complaining of bilateral sacroiliac joint pain and that Plaintiff said that she had a "numby" feeling when driving a forklift; that her pain remained in her low back; that her pain was five on a ten point scale; and that she had almost fallen down, "but ha[d] not actually fallen." Dr. Ryan noted that Plaintiff had tenderness in her sacroiliac joints and a negative bilateral straight leg raise; that she had a mildly positive bilateral Patrick's test and a Faber's test bilaterally produced mild pain; that Plaintiff had flexion of forty-five degrees, extension of ten degrees, and left lateral bending at ten degrees; that Plaintiff had a bilateral sacroiliac joint strain; that Plaintiff should discontinue Celebrex and continue with Bextra; and that Plaintiff should not lift, push or pull anything over twenty pounds. Tr. 217.

Physical therapy records from Health South state that on October 28, 2002, in regard to self-exertion, Plaintiff reported "a score of 44% yet perfrom[ed] an hour and [sic] of workout with no complaints and discomfort." In regard to Plaintiff's atypical behavior, the physical therapist reported on this date that Plaintiff had "44% on oswestry, reports [she] cannot walk more than half mile but does that in clinic, reports cannot stand more than 30 minutes but does 10 minutes on the eliptical and walks >½ mile in clinic and stands for >20 minutes during PT with no C/O." Tr. 301-302.

A medical record of October 28, 2002, from Prompt Care states that Plaintiff presented for a rash; that she reported an increase in physical activity; and that Plaintiff appeared to be well-developed and in no acute distress. Tr. 156.

Dr. Ryan reported on October 29, 2002, that Plaintiff presented complaining of low back pain from her October 2002 injury; that Plaintiff estimated a one percent improvement from the date of her injury; that Plaintiff said the pain was at a six on the date of the visit; and that Plaintiff stated she wanted stronger pain medication. Dr. Ryan further reported that she felt that referral to a psychiatrist

for further evaluation and recommendation for treatment was warranted; and that Plaintiff should return to limited duty on that date with restrictions of no lifting, pushing, or pulling. Tr. 215-16.

A record dated November 6, 2002, from Prompt Care states that Plaintiff was "very anxious and crying"; that Plaintiff was upset about work; that Plaintiff reported that "she had some problems in the parking area and she felt she was being picked on by management"; that Plaintiff stated she was almost fired; and that Plaintiff stated that "has been under a lot of stress especially at work and she said she would like to get a couple of weeks off" and that "she cannot go back to work right now." The examiner reported that he or she felt "strongly [that Plaintiff] ought to take off a couple of weeks"; that Plaintiff's "work performance [was] not able to improve anyway"; that Plaintiff was not suicidal; and that Plaintiff should take Wellbutrin in addition to the Paxil and Xanax that Plaintiff was currently taking. Tr. 157.

Records reflect that Plaintiff was discharged from physical therapy on November 11, 2002. Notes of this date state that Plaintiff had full excursion/no deficits in regard to flexibility of the gastrocnemius and hamstrings; that Plaintiff had a slight restriction of flexibility in the hip external rotators; that Plaintiff had a mild restriction in the iliopsoas, on the left and full excursion/no deficits on the right; that, in regard to range of motion, Plaintiff had 30% extension, 50% flexion, 50% rotation left, 40% rotation right, and 50% side bending right; that Plaintiff had atypical pain behavior; and that Plaintiff's goals had been met. Tr. 297-300.

A Prompt Care November 20, 2002 note states that Plaintiff reported that she was better "but not ready to go back to work"; that the examiner found no physical problem "but I think mentally she has been under a lot of stress at work"; and that the examiner did not know the reason for the stress "but would like to recommend maybe switching to a different type of job." Tr. 157.

Saint Francis Medical Center records of January 13, 2003, reflect that Plaintiff presented in the emergency room after her left foot was run over by a forklift; that an x-ray of Plaintiff's left foot and ankle showed that no fractures were present; and that she had a bruise on her foot. A radiology report of this date states that Plaintiff's "bone alignment and mineralization [were] within normal limits"; that her joints were well maintained; and that no fracture, subluxation or osteolytic process was identified. Tr. 208-10, 213-14.

A March 7, 2003 report from Prompt Care reflects that Plaintiff had back pain; that a back examination was "non-revealing"; that there was no CVA tenderness upon examination; that Plaintiff's straight leg raise was negative; and that Plaintiff was prescribed Soma and Bextra. Tr. 152.

Saint Francis Medical Center records, dated March 17, 2003, reflect that Plaintiff presented in the emergency room complaining of low-back pain from lifting boxes; that Plaintiff reported a sharp radiating pain in her left buttock and mid to lower back, which was exacerbated by movement and flexing; that Plaintiff had prior back injuries; and that Plaintiff was given Thyroidal and Norflex for pain relief. Tr. 203-206.

Dr. Ryan's notes of March 18, 2003, reflect that Plaintiff presented for a follow-up evaluation in regard to the March 17, 2003 emergency room visit; that Plaintiff told Dr. Ryan that her pain had gotten worse and that she was relieved by lying on the side, standing, and walking; that Plaintiff was working without restrictions; that Plaintiff had tenderness in the lower left paravertebral areas; that she had a negative Patrick's bilaterally and a negative straight leg raise; that she had pain with ninety degrees flexion, with ten degrees extension, and in the right and left lateral bending at five degrees; that Plaintiff had no pain with left and right rotation at five degrees; that her lower extremity muscle strength was 5/5; that her knee and ankle reflexes were 2+; that she could squat and walk on heels and toes without difficulty; that Plaintiff should continue with physical therapy and ice; that Plaintiff

could not lift, push or pull over twenty pounds; and that her injury was work-related with a "medical degree of certainty." Tr. 201-202.

Dr. Ryan's March 25, 2003 office notes reflect that Plaintiff presented in regard to her March 13, 2003 injury and that Plaintiff told Dr. Ryan that she estimated a sixty percent improvement since the injury; that she was on limited work duty; and that she did not have any pain, numbness, tingling or weakness in her legs. Dr. Ryan reported on this date that Plaintiff was alert and under no acute distress; that Plaintiff's blood pressure was 126/77; that Plaintiff's left paravertebral muscles were tender when palpitated; that Plaintiff's straight leg raise was negative bilaterally; that she had full range of motion without significant pain, and sensation was intact in her lower extremities; that Plaintiff's motor strength in the lower extremity muscle group was 5/5 and her knee and ankle reflexes were +2; that she could squat and walk on heels and toes without difficulty and possessed a normal gait; that the assessment was that Plaintiff had lumbar strain; and that Plaintiff should continue Bextra and Skelaxin and her home exercise program. Tr. 199-200.

Dr. Ryan reported on April 1, 2003 that Plaintiff's medications included Wellbutrin, Skelaxin, Allegra D, Ultracet, Xanax, Paxil, Bextra and Neurontin; that Plaintiff complained of low-back pain from an injury incurred on January 13, 2003; that Plaintiff had responded well to an increase in Neurontin; that Plaintiff reported to Dr. Ryan that she did not have any leg pain, numbness, tingling or weakness in her legs; that Plaintiff had "some mild tenderness to palpation in the paravertebral areas in the lower lumbar spine bilaterally"; that Plaintiff had a negative bilateral leg raise; that Plaintiff had flexibility to ninety degrees, extension of ten degrees, and right and left lateral bending to about ten degrees; that Plaintiff had reached maximum medical recovery and was released from care; and that this was a work related injury. Tr. 197-98.

A Prompt Care medical record, dated April 16, 2003, reflects that Plaintiff weighed 118 pounds; that her blood pressure was 122/80; that Plaintiff reported continued pain in her left shoulder and lower back; that Plaintiff was taking Neurontin; that Plaintiff was taking Bextra "with little improvement of her symptoms"; that Plaintiff's prior physical therapy was unsuccessful; and that on examination, Plaintiff had musculoskeletal pain in the lower back and pain in her posterior and anterior left shoulder. Notes of this date also state that Plaintiff possessed good hand grip; that her straight leg raise was negative bilaterally; that physical therapy was recommended, "[h]owever, [she] is not willing to continue therapy since she has tried it already"; and that "if problem continues" an orthopedic consultation was recommended. Tr. 152.

A Prompt Care record of May 5, 2003, reflects that Plaintiff had fatigue. Tr. 148-149.

An June 16, 2003 record from Prompt Care reflects that Plaintiff complained of shoulder pain in the left side of her neck and shoulder, and that Plaintiff was given a refill of Xanax and prescribed Skelaxin. Tr. 147.

July 22, 2003 notes from Prompt Care reflect that Plaintiff reported low back pain and bilateral hip pain that was "from her work where she has to push heavy loads"; that Plaintiff had "been advised by Dr. Icaza, [her] regular doctor, to find a different job"; that she was "unwilling [to do so] because of the financial gain she obtain[ed] from the job"; that Plaintiff had no acute distress; that her back was not tender when palpated; that her upper extremity reflexes had good pulses; that her lower extremities displayed normal range of motion at the hips and had no tenderness when palpated; that she had "good strength, sensation and reflexes and good pulses"; and that she was prescribed Mobic and scheduled for physical therapy. Tr. 147.

A Prompt Care August 4, 2003 note reflects that Plaintiff reported that her nerves were "much worse"; that she was "still depressed"; that she continued to have back and hip pain; that "at

work she [had] to lift 50 pound boxes which she cannot handle"; that a Work Hardening Program was to be scheduled; and that Plaintiff was prescribed Naproxen, Wellbutrin, and Paxil. Tr. 147.

Roderic C. Crist, M.D., of Southeast Missouri Hospital Emergency Department, reported on August 15, 2003, that Plaintiff presented for a possible panic attack and that she was stable. Records of this date further state that Plaintiff's history was that she suffered from generalized anxiety disorder; that Plaintiff had experienced an attack that afternoon at work when she was asked "to perform a job which she was frightened to do"; that Plaintiff experienced chest pain, shortness of breath, rapid heart rate, weakness, and began "to become near syncopal, vision [began] to white out and black out"; that when she has a panic attack she "feels like she is going to pass out but she never completely loses consciousness"; that Plaintiff had not experienced an anxiety attack "for weeks if not months"; and that Dr. Icaza was treating her for this condition. Dr. Crist noted that Plaintiffs's medications included Paxil, Wellbutrin, Xanax, and Naprosyn; that Plaintiff had taken three Xanax before arriving at the hospital; that her panic symptoms were resolved a few hours after her arrival at the hospital; that Plaintiff stated she felt normal; that Dr. Crist believed "in [his] heart of hearts that [Plaintiff's] reason for coming [to the hospital] now is to get a work excuse off until she sees Dr. Icaza on Monday"; that Dr. Crist felt that Plaintiff "simply [did] not feel competent to return to work"; that Plaintiff's other symptoms were negative; that Plaintiff did not appear to be under acute stress; and that Plaintiff's panic attack had been resolved. Tr. 374-76.

A Prompt Care August 18, 2003 note reflects that Plaintiff weighed 121 pounds; that her blood pressure was 120/78; that Plaintiff said that she had a panic attack at work when "she was asked to pull a trailer with a machinery and she knew she couldn't do it"; that it was suggested that Plaintiff "maybe" seek alternative employment; and that Plaintiff was instructed not return to work for the remainder of the week. Tr. 147.

August 25, 2003, notes from Prompt Care state that Plaintiff had anxiety disorder; that she weighed 128 pounds; that her blood pressure was 124/78; that Plaintiff had quit work and was seeking alternative employment with less stress; that Plaintiff was otherwise doing well; and that Plaintiff should return in three months. Tr. 146.

A September 12, 2003 note from Prompt Care states that the examiner recommended that Plaintiff go to the Community Counseling Center "so she [could] apply for Social Security Disability ... on the basis of anxiety disorder which she denies being any more anxious since she quit her job or depressed." Tr. 146.

Prompt Care notes, dated December 5, 2003 state that Plaintiff had "panic disorder, mild depression, [and] fibromyalgia symptoms with trigger point tenderness lower back and right infrascapular region"; that Plaintiff indicated that pain was present in her SI joint bilaterally left shoulder; that the examiner conducted an extensive interview and workup; that Plaintiff had "several limitations for working that [included] having severe stress and panic disorder from working in a crowded place where there are a lot of people or a dark environment"; and that she "may be disabled based on physical findings." Tr. 146.

Records of Southeast Missouri Hospital, dated December 15, 2003, reflect that Plaintiff presented for x-rays of her hips and for a lumbar spine series. A radiology report prepared by Raleigh F. Johnson, M.D., states that x-rays of Plaintiff's right and left hip showed normal bone alignment and mineralization; that the joint spaces were well maintained; that no identifiable fracture, subluxation or osteolytic process were present; and that the impression was "within normal limits." A spine lumbar report prepared by Dr. Johnson on this date states that the "AP and lateral views of the lumbar spine show partial sacralization of L5 on the right"; that there was no evidence of fracture, subluxation, spondylolysis or spondylolisthesis; that minimal spondylosis was indicated at L5; that

L3-4 had slight narrowing compared to the levels surrounding levels; and that "transverse process and pedicles appear intact." Dr. Johnson further stated that a "Hip Routine LT" was within normal limits. Tr. 371-73.

A December 17, 2003 record from Prompt Care indicates that Plaintiff weighed 121 pounds; that her blood pressure was 118/76; that Plaintiff was diagnosed with a "slight disc space narrowing at L3-4 with minimal spondylosis [at] L5"; that her hip was within normal limits; that the examiner recommended that Plaintiff take Vioxx on a daily basis; that arthritis problems were suspected; and that "[i]f no improvement" a rheumatology consultation was recommended. Tr. 146.

A January 14, 2004 letter from Anthony J. Keele, M.D., to the Missouri Department of Elementary and Secondary Education Section of Disability Determinations states that Plaintiff complained of "nerve problems, back problems, arthritis in her left shoulder, back and knees"; that Plaintiff stated she quit her job as a forklift operator at Rubbermaid in August 2003; that Plaintiff complained of back pain over the last two and a half years since falling on an iron bar and "has arthritis in her left heel, back, and knees"; that Plaintiff was alert, spoke normally, and was well-nourished; that her heart rate was normal, her lungs were clear, and her vision was 20/20 in the right eye and 20/40 on the left eye; that Plaintiff's upper and lower extremities were warm and dry without any edema; that Plaintiff's abdomen was "soft with normoactive bowel sounds"; that Plaintiff's cranial nerves were intact, her bilateral strength was 5/5 in both extremities, and she had a normal gait and heel to toe walking; that Plaintiff did not have signs of organ damage; that Plaintiff could sit for six to eight hours and stand for three to four without a break; that Plaintiff can walk a mile and lift and carry thirty pounds; that she had no problems hearing, handling objects, speaking and traveling; that Plaintiff had chronic pain syndrome; that the MRI revealed "age related degenerative changes"; that Plaintiff's examination was normal and no findings "would support limitations from performing

normal work functions"; and that Dr. Keele's impression was that Plaintiff had a history of anxiety disorder and chronic musculoskeletal pain. Tr. 377-79.

A Prompt Care January 23, 2004 note states that Plaintiff reported having "episodes in which she kind of stared out into space and was aware of her surrounding and could look around"; that she did not lose consciousness; that she was "shaking all over."  The examiner reported that Plaintiff "appear[ed] to be in no acute distress," "but [] she was kind of shaking all over"; that "an acute panic attack" was "suspected"; that Plaintiff's heart was "in sinus rhythm"; and that it was recommended that Plaintiff increase her Xanax and continue Wellbutrin and Paxil. Tr. 144.

A January 28, 2004 record from Prompt Care reflects that Plaintiff reported that she had persistent pain  across her lower back; that Plaintiff did not report numbness or tingling in her lower extremities; that tenderness of the SI joint bilaterally was noted on examination; that her spinal x-ray from December 15, 2003, was reviewed and that it indicated "disc space narrowing at L3-4 with minimal spondylosis L5 with partial sacralization of L5 on the right"; that the remainder of her back was non-revealing; that her patellar reflexes were normal; that her straight leg raise was negative; that a spinal MRI was scheduled; and that Plaintiff was given Vioxx and Ultracet for pain. Tr. 146.

A February 7, 2004 radiology report of Andrew E. West, M.D., of Saint Francis Medical Center, states that an MRI was conducted of Plaintiff's lumbar spine; that the location and morphology of the conus medullaris were normal; that the height, contour, alignment, and intrinsic mural signal intensity of her lumbar vertebral bodies were normal; that no significant loss of intervertebral disc height was present; that Plaintiff had "L2-3 through L4-5 disc desiccation"; that a minimal circumferential disc bulge eccentric to the left was present at the L2-3 level; that Plaintiff had a "minor left inferior foraminal encroachment secondary to bulging disc without foraminal stenosis"; that a "diffuse circumferential disc bulge with a superimposed broad-based right foraminal

and lateral disc protrusion" was present at L3-4 and a "[p]rotruding disc approximates the existing right L3 nerve root contributing to minimal foraminal stenosis"; that at L3-4 an "associated annular signal compatible with annular tear/fissure" and bilateral facet arthropathy were present; that a mild diffuse circumferential disc bulge slightly eccentric to the left existed at Plaintiff's L4-5 level; that, at her L4-5 level, there was a bilateral facet arthropathy, a "left posterior annular signal in the formaminal region compatible with annular tear or fissure," and a "mild to moderate left greater than right foraminal narrowing secondary to bulging disc and facet hypertrophy"; that minor facet arthropathy existed at the L5-S1; that between the L5 transverse process and sacrum pseudoarticulation was present; and that "[m]inor sacroiliac osteoarthritic changes were noted." Tr. 193-94

Prompt Care records of February 20, 2004, state that Plaintiff presented an MRI report to the examiner; that Plaintiff had "a possible S3 disc protrusion narrowing"; that a neurosurgery consultation with Dr. Park was recommended; and that Plaintiff was prescribed Skelaxin and Ultracet. Tr. 143.

Prompt Care records of March 15, 2004, state that Plaintiff complained of sinus drainage and a sore throat, and that, on examination, Plaintiff appeared normal and was otherwise asymptomatic. Tr. 143

An office note from Kee B. Park, M.D., dated March 15, 2004, reflects that Plaintiff complained of back and left leg pain, "but predominantly back pain"; that Plaintiff was visiting Dr. Park on her own insurance; that Plaintiff reported that she did not work; that Plaintiff estimated that her pain was a six to ten on a scale of one to ten and that the pain increased with any activity, "especially sitting for a long period of time"; that Plaintiff used tobacco and alcohol; that Plaintiff said that her back and hip hurt constantly; and that Plaintiff was currently taking Xanax, Paxil, Wellbutrin,

Propanolol, Vioxx, and Skelaxin. Dr. Park further reported, pursuant to neurological examination, that Plaintiff was well nourished and groomed; that her optic discs were flat; that full strength was present in all extremities; that she had a normal gait; that her deep tendon reflexes were 2+; that she had spinal pain around the L4-5 and L5-S1 area; that she had a full visual field and facial sensation intact; and that Plaintiff's sensory was intact throughout. Dr. Park also reported that an MRI of "the L4-5 high intensity zone towards the foramen on the left and L3-4 high intensity zone towards the foramen on the right" was conducted; that Plaintiff had "L3-4 and L4-5 annular tears probably causing discogenic pain"; that Dr. Park suspected "that the L4-5 level is the source of [Plaintiff's] pain since it is off to the left side"; and that Dr. Park recommended that Plaintiff be treated with a series of injections. Tr. 385-86.

Dr. Park reported on March 25 and April 15, 2004, that Plaintiff had "L4-L5 transforminal epidural steroid injection[s] on right with fluoroscopy and epiduroscopy" on these dates. Tr. 383-384.

A March 31, 2004 note from Prompt Care states that Plaintiff reported that Dr. Park injected her with Cortisone and that she felt "a little bit better." Tr. 143.

An April 26, 2004 note from Prompt Care states that Plaintiff complained of allergic rhinitis; that Plaintiff had gone to the Pain Clinic for her back pain; that she reported that her pain was somewhat better; that a HEENT revealed clear nasal discharge; that the exam was normal otherwise; and that Plaintiff was advised to perform abdominal exercises. Tr. 143.

Radiologist Jeffery Gremmels of Saint Francis Medical Center, reported on November 2, 2004, that the impression from a CT examination of Plaintiff's paranasal sinuses was that there was no "visualized abnormality." Tr. 192.

On April 25, 2005, James M. Spence, Ph.D., completed a psychiatric review technique form in which he evaluated Plaintiff. Dr. Spence reported that Plaintiff had no severe medical impairments;

that Plaintiff had an anxiety-related disorder diagnosed as Dx panic attack; that Plaintiff's symptoms were mild in the areas of restriction of daily living activities, maintaining social functioning, and maintaining concentration, persistence, or pace; that Plaintiff had one emergency room visit for a panic attack in August 2003 that was resolved with Xanax; that Plaintiff had prescriptions for anti-anxiety and anti-depressants; that Plaintiff has no history of inpatient or outpatient psychiatric treatment; that no overt symptoms were noted; that Plaintiff was able to grocery shop; and that Plaintiff's statements were "partially [credible], as totality of MER supports [a] non-severe assessment." Tr. 112-13

J. Diemer, M.D., reviewed Plaintiff's medical records and conducted a physical residual functional capacity assessment ("RFC") of Plaintiff on April 26, 2005. Dr. Diemer's RFC assessment states that Plaintiff's chief complaint was back problems; that Plaintiff can occasionally lift fifty pounds, frequently lift twenty-five pounds, and sit/stand for approximately six-hours in an eight-hour day; that Plaintiff is unlimited in her ability to push or pull; and that Plaintiff has no postural, manipulative, visual, or communicative limitations; and that Plaintiff's only environmental limitation is that she avoid concentrated exposure to vibrations. Dr. Diemer noted that Plaintiff stated that she was able to grocery shop, lift twenty pounds, and prepare simple meals, and that Plaintiff's statements were partially credible. Tr. 93-100.

Prompt Care records, dated March 24, 2006, reflect that Plaintiff presented for a follow-up from an emergency room visit which was the result of an alleged assault committed by her brother; that Plaintiff stated that her brother hit, strangled, and threatened her; that her brother remained in police custody; that a CT scan of the chest was normal and an x-ray of chest and neck were normal; that Plaintiff was stiff and had numerous bruises; that Plaintiff chronically used tobacco; that Plaintiff appeared to be a "well-developed, well-nourished female with multiple contusions over the face, neck,

and upper extremities"; that Plaintiff's neck had a normal range of motion; that the examiner spoke to Plaintiff about her tobacco use; and that a follow-up was needed. Tr. 390.

William K. Kapp, M.D., reported on November 20, 2006, that Plaintiff was to receive out-patient surgery on November 22, 2006. Notes reflect that Plaintiff stated that she fell on November 18, 2006, and had a left elbow fracture; that Plaintiff smoked two packs of cigarettes and drank alcohol on a daily basis; and that a x-rays revealed a left displaced distal humerus fracture. Records further reflect that on November 22, 2006, Dr. Kapp performed an open reduction and internal fixation of Plaintiff's left elbow distal humerus fracture; that Plaintiff's insurance coverage was current or active, no pre-certification was needed for the procedure; that two 4.5 cannulated screws were inserted; that post-surgery lateral films showed that the visualized portions of the radius and ulna were well maintained. Tr. 414-16, 429-30.

Dr. Kapp's notes of November 27, 2006, reflect that Plaintiff presented for a follow-up for her elbow surgery; that the "nerve was negative contused at the time of repair but the alignment [looked] good"; that Plaintiff had developed a radial nerve palsy after the operation and had some mild traction in surgery; that Dr. Kapp "anticipate[d] that this [problem] should resolve itself"; that Plaintiff's wounds were currently clean and dry; that x-rays showed "good alignment in the AP and lateral planes"; that Plaintiff's arm was placed in a long arm cast; that her cast and sutures would be removed in two weeks; and that Plaintiff was told that it could take six months to recover from her radial nerve palsy. Tr. 417.

Dr. Kapp reported on December 11, 2006, that Plaintiff was "making slow but steady progress"; that Plaintiff had a fairly dense radial nerve palsy that was present prior to the operation; that Plaintiff had Tinels that radiated down to her hand; that Plaintiff would be placed in a posterior

splint; that x-rays of the AP and lateral planes showed excellent alignment; and that Plaintiff was given a prescription for Vicodin. Tr. 418.

Dr. Kapp reported on January 8, 2007, that he prescribed Vicodin for Plaintiff; that Plaintiff was doing well; that Plaintiff reported that she had pain in her anterior lateral elbow complex; that Plaintiff had a dense radial nerve pulse; that Plaintiff was six weeks out of surgery; and that Dr. Kapp would schedule Plaintiff for an EMG/NCV of her left upper extremity. Tr. 418.

Bernard C. Burns, D.O., reported on January 11, 2007, that Dr. Kapp referred Plaintiff for an EMG; that on examination, Plaintiff's MS 0/5 finger and wrist extensor were weak, MS 4-4+/5 intrinciscs and thumb motion were preserved, and "DTR's, pulses, ROM and MS all otherwise WNL"; that an EMG needle report revealed that "severe near complete denervation [of] all radial muscles" was present; that Plaintiff possessed severe radial neuropathy and "[v]ery rare MUAP's seen in EDC only"; and that Dr. Burns recommended that the EMG be repeated in three to four weeks "if no significant clinical improvements" were seen. Tr. 419.

Dr. Kapp's January 12, 2007 notes state that Plaintiff was "making slow but steady progress"; that her radial neuropathy remained dense; and that exploration of the nerve would be considered in two weeks, "if she is still fairly dense at that time." Tr. 419.

Dr. Kapp reported on January 26, 2007, that Plaintiff was to have outpatient PASC surgery on January 30, 2007 for radial nerve exploration in the left upper extremity; that Plaintiff had "little if any evidence of recovery"; and that Dr. Kapp was concerned about entrapment of the radial nerve. Tr. 420.

Dr. Kapp reported on January 30, 2007, that Plaintiff underwent a left radial nerve exploration with neurolysis for her left radial nerve deficit in the left upper extremity; that the radial nerve was scared at the fracture sight; that the "nerve was noted to be fibrotic ... although it was in continuity";

that no entrapment of the nerve at the fracture site was evidenced; and the Plaintiff was in stable condition in the recovery room. Tr. 431.

Dr. Kapp's February 2, 2007 office notes reflect that Plaintiff's wounds were clean and dry; that Dr. Kapp was sending Plaintiff to the "Hand Center for [range of motion] and strengthening exercises"; that Plaintiff's progress was slow and steady; that Plaintiff had a dense radial nerve deficit; that "whether or not" the radial nerve recovered "remain[ed] to be seen"; and that Plaintiff would "probably be a candidate for radial tendon transfers." Tr. 421.

Dr. Kapp reported on February 12, 2007, that Plaintiff had improved; that her digitorum connexus had improved; that Plaintiff should continue working on her range of motion exercises in her elbow and on strengthening; and that she should begin dynamic and static splinting. Tr. 422.

Dr. Kapp reported on March 5, 2007, that Plaintiff presented for a follow-up to her January 20, 2007 surgery; that Plaintiff reported that pain continued in her upper left extremity; that Dr. Kapp would refer Plaintiff to Dr. Lents to be evaluated for a radial tendon transfer; that Plaintiff's motion had improved; that she was down to negative ten degrees passively; that Plaintiff would continue to work on passive motion; and that Plaintiff was to be given an elbow splint. Tr. 423.

A record of March 8, 2007, reflects that Dr. Kapp ordered a refill of Plaintiff's Vicodin prescription. Tr. 423.

Rickey L. Lents, M.D., reported on March 15, 2007, that Plaintiff was referred to him by Dr. Kapp; that her medical history was reviewed; that Dr. Lents's examination of Plaintiff revealed that she had a complete dense radial nerve palsy on the left; that Dr. Lents discussed the procedural benefits and risks of an operation with Plaintiff; that Plaintiff indicated that she understood these risks; and that Dr. Lents would schedule a high radial nerve tendon transfer. Tr. 424.

Dr. Kapp's note dated March 21, 2007, states that a Vicodin refill was ordered for Plaintiff. Tr. 424.

Records dated March 28, 2007, reflect that Dr. Lents performed a "tendon transfer left upper extremity; that the operation was for Plaintiff's high radial nerve palsy in her left arm; and that no complications were present during the surgery. Tr. 425, 432-433.

Dr. Lents's records of April 5, 2007, reflect that Plaintiff presented for a follow-up to the March 28 surgery; that Plaintiff was doing well; that he would place a "short arm thumb spica splint with the fingers in intrinsic plus" on Plaintiff; and that Plaintiff was given a refill of her Vicodin prescription. Tr. 425.

Dr. Lents reported on April 12, 2007 that Plaintiff's wounds were healing well; that Dr. Lents thought the splint had caused swelling in Plaintiff's hand; that Plaintiff would need OT for the swelling; that Dr. Lents refilled Plaintiff's Vicodin prescription; and that her sutures were removed. Tr. 425.

Dr. Lents reported on April 26, 2007, that Plaintiff had good finger, thumb and wrist extension; that the splint caused Plaintiff's hand to swell; that the splint would be discontinued; that Plaintiff would begin re-education and active range of motion OT; and that Plaintiff received a refill of her Vicodin prescription. Tr. 426.

Dr. Lents reported on May 10, 2007, that Plaintiff's "repair [was] intact but her wrist [was] stiff"; that Plaintiff was to continue therapy; and that Plaintiff was prescribed Vicodin. Tr. 426.

A May 23, 2007 note from Dr. Lents reflects that Plaintiff received a prescription for Darvocet. Tr. 426.

Dr. Lents' May 24, 2007 notes state that Plaintiff could dorsiflex her fingers, thumb and wrist, "although weakly"; that Plaintiff was stiff; that Plaintiff should continue working on active range of motion; and that Plaintiff was placed in an outrigger splint. Tr. 427.

A June 4, 2007 office note of Dr. Lents reflects that Plaintiff's Vicodin prescription was refilled. Tr. 427.

Dr. Lents reported on June 7, 2007, that examination showed that Plaintiff's finger extension had improved; that Plaintiff's could extend her wrist well; that thumb extension was present; that all her transfers were intact; that Plaintiff wanted to remove her splint; and that Dr. Lents thought "this is fine, may help her use her hand a bit more." Tr. 428.

A June 21, 2007 office note from Dr. Lents states that Plaintiff had greatly improved; that her motion and strength were better; that Plaintiff should continue exercising at home; and that Dr. Lents removed one remaining suture from Plaintiff. Tr. 428.

## C. Worker's Compensation Settlements.

Records reflect that on April 24, 2003, five workers' compensation settlement agreements were reached between Plaintiff, Rubbermaid, and the insurance company. Pursuant to the settlement agreements, Plaintiff would receive $2,240.05 in compensation for her low back injury dated July 10, 2001, which resulted in 1.7% of body injury; Plaintiff would receive $2,240.05 for her low back injury dated August 23, 2001, which resulted in 1.7% of body disability; Plaintiff would receive $2,240.08 in compensation for her left-shoulder injury dated February 12, 2002, which resulted in 1.7% of body disability; Plaintiff would receive $2,240.05 in compensation for her low back injury of March 22, 2002, which resulted in 1.7% of body disability; and Plaintiff would receive $2,240.05 in compensation for her low back injury received on June 29, 2002, which resulted in 1.7% body

disability. Pursuant to the settlement agreements, Plaintiff's employer and the insurance company would also pay certain medical expenses. Tr. 65-68.

# IV.
## LEGAL STANDARDS

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529. "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'" Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)). In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. §§ 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities …" Id. "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001) (citing Nguyen v. Chater, 75 F.3d 429, 430-31 (8th Cir. 1996)). Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d); Part 404, Subpart P, Appendix 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. Id. Fourth, the impairment must prevent claimant from doing past relevant work. 20 C.F.R. §§ 416.920(e), 404.1520(e). The burden rests with the claimant at this fourth step to establish his or her RFC. Eichelberger, 390 F.3d at 590-91; Masterson v.

Barnhart, 363 F.3d 731, 737 (8th Cir. 2004); Young v. Afpel, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). The ALJ will review a claimant's residual functional capacity and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. §§ 404.1520(f). Fifth, the severe impairment must prevent claimant from doing any other work. 20 C.F.R. §§416.920(g), 404.1520(g). At this fifth step of the sequential analysis, the Commissioner has the burden of production to produce evidence of other jobs in the national economy that can be performed by a person with the claimant's RFC. Young, 221 F.3d at 1069 n.5. If the claimant meets these standards, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." Id.

Even if a court finds that there is a preponderance of the evidence against the ALJ's decision, that decision must be affirmed if it is supported by substantial evidence. Clark v. Heckler, 733 F.2d 65, 68 (8th Cir. 1984). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002). See also Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007). In Bland v. Bowen, 861 F.2d 533 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

Id. at 535. See also Lacroix v. Barnhart, 465 F.3d 881, 885 (8th Cir. 2006) ("[W]e may not reverse merely because substantial evidence exists for the opposite decision.") (quoting Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)); Hartfield v. Barnhart, 384 F.3d 986, 988 (8th Cir. 2004) ("[R]eview of the Commissioner's final decision is deferential.").

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical impairment which can be expected to result

in death or has lasted or can be expected to last for a continuous period of not less than 12 months."

42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A).

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  When evaluating evidence of pain, the ALJ must consider:

> (1) the claimant's daily activities;
>
> (2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain;
>
> (3) any precipitating or aggravating factors;
>
> (4) the dosage, effectiveness, and side effects of any medication; and
>
> (5) the claimant's functional restrictions.

Baker v. Sec'y of Health & Human Servs., 955 F.2d. 552, 555 (8th Cir. 1992); Polaski, 739 F.2d at 1322.

An ALJ must specifically demonstrate that he considered all of the evidence. Robinson, 956 F.2d at 841; Butler v. Sec'y of Health & Human Servs., 850 F.2d 425, 429 (8th Cir. 1988).

Residual functional capacity is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a), and includes an assessment of physical abilities and mental impairments.  20 C.F.R. § 404.1545(b-e). The Commissioner must show that a claimant who cannot perform his or her past relevant work can perform other work which exists in the national economy. Karlix v. Barnhart, 457 F.3d 742,746 (8th Cir. 2006); Nevland, 204 F.3d at 857 (citing McCoy v. Schweiker, 683 F.2d 1138, 1146-47 (8th Cir. 1982) (en banc)).  The Commissioner must first prove that the claimant retains the residual functional capacity to perform other kinds of work. Goff, 421

F.3d at 790; <u>Nevland</u>, 204 F.3d at 857. Once the plaintiff's capabilities are established, the Commissioner has the burden of demonstrating that there are jobs available in the national economy that can realistically be performed by someone with the plaintiff's qualifications and capabilities. <u>Goff,</u> 421 F.3d at 790; <u>Nevland</u>, 204 F.3d at 857.

**V.**
**DISCUSSION**

The issue before the court is whether substantial evidence supports the Commissioner's final determination that Plaintiff was not disabled. <u>Onstead</u>, 962 F.2d at 804. Thus, even if there is substantial evidence that would support a decision opposite to that of the Commissioner, the court must affirm the decision of the Commissioner as long as there is substantial evidence in favor of the Commissioner's position. <u>Cox</u>, 495 F.3d at 617; <u>Krogmeier</u>, 294 F.3d at 1022.

Plaintiff alleges, among other things, that the ALJ failed to consider objective evidence in regard to determining Plaintiff's credibility and that the ALJ erred in considering Plaintiff's inability to afford medication and use of alcohol.

 The ALJ did not consider Plaintiff's medical records from November 20, 2006, through June 7, 2007, as they were not part of the record before him. These supplemental records concern Plaintiff's elbow surgery, her left radial nerve exploration, and her radial nerve tendon transfer. Pursuant to a request from Plaintiff's counsel, the Appeals Council made the supplemental records part of the record. The Appeals Council affirmed the ALJ's decision without comment.

Under agency regulations, the Appeals Council must consider additional evidence that is new, material, and relates to the period on or before the date of the ALJ's decision. 20 C.F.R. § 404.970(b). "To be 'new,' evidence must be more than merely cumulative of other evidence in the record." <u>Bergmann v. Apfel</u>, 207 F.3d 1065, 1069 (8th Cir. 2000). Evidence is material if it is "relevant to [a] claimant's condition for the time period for which benefits were denied." <u>Id.</u>

While the supplemental records submitted to the Appeals Council reflect that Plaintiff improved, they do not reflect the extent of Plaintiff's recovery. Significantly, upon finding Plaintiff not disabled, the ALJ considered that Plaintiff did not have any surgeries and that she was not taking prescription pain medication. The supplemental records presented to the Appeals Council not only reflect that Plaintiff had surgery, but that she took prescription pain medication after surgery. Indeed, as of June 4, 2007, she was taking Vicodin. Plaintiff's medical records from November 20, 2006, through June 7, 2007, are material to a determination whether or not she can engage in substantial gainful activity. Moreover, these records are not cumulative. See Bergmann, 207 F.3d at 1069. The court is unable to discern whether the Appeals Council considered the new and material evidence which it made part of the record. The court finds, therefore, that it cannot be said that the decision of the Commissioner, in regard to Plaintiff's alleged physical impairments, is supported by substantial evidence. Under such circumstances it is appropriate to remand this matter to the ALJ. See Lamp v. Astrue, 531 F.3d 629, 633 (8th Cir. 2008) (remanding to the ALJ were the record did not indicate if the Appeals Council considered new and material evidence); Gartman v. Apfel, 220 F.3d 918, 922 (8th Cir. 2000) (remanding to the ALJ where the record did not clearly indicate whether the Appeals Council considered new and material evidence which was submitted after the ALJ's decision).

The court finds, therefore, that this matter should be reversed and remanded to the Commissioner of Social Security for further consideration pursuant to 42 U.S.C. 405(g), sentence 4. Upon remand, the ALJ should be directed to fully develop the record in a manner consistent with this court's opinion. In particular, the ALJ should obtain a medical examination of Plaintiff and an evaluation of her physical condition. The ALJ should request that the examiner opine regarding Plaintiff's exertional limitations and/or complete a physical residual functional capacity evaluation. Also, upon remand, Plaintiff may submit an evaluation conducted by an examiner of her choice.

The court stresses that upon reversing and remanding this matter it does not mean to imply that the Commission should return a finding of "disabled." The court is merely concerned that the Commissioner's final determination, as it presently stands, is not fully developed concerning Plaintiff's allegation that she is disabled. As such, it cannot be said that the decision is supported by substantial evidence in this regard.

## VI.
## CONCLUSION

The court finds that this matter should be reversed and remanded to the Commissioner of Social Security for further consideration pursuant to 42 U.S.C. 405(g), sentence 4. Upon remand, the ALJ should fully develop the record in a manner consistent with this court's opinion. The court again stresses that upon recommending that this matter be reversed and remanded it does not mean to imply that the Commission should return a finding of "disabled." The court is merely concerned that the Commissioner's final determination, as it presently stands, is not supported by substantial evidence on the record as a whole.

**ACCORDINGLY,**

**IT IS HEREBY RECOMMENDED** that this matter be reversed and remanded;

**IT IS FURTHER RECOMMENDED** that a Judgment of Reversal and Remand issue remanding this case to the Commissioner of Social Security for further consideration pursuant to 42 U.S.C. 405(g), sentence 4.

**IT IS FURTHER RECOMMENDED** that upon entry of the Judgment, the appeal period will begin which determines the thirty (30) day period in which a timely application for attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412, may be filed.

/s/Mary Ann L. Medler
MARY ANN L. MEDLER
UNITED STATES MAGISTRATE JUDGE

Dated this <u>8th</u> day of  July, 2009.